COMMONWEALTH *vs.* DANA E. LOPES.

Barnstable. December 5, 2003. - January 22, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Jury and Jurors. Practice, Criminal,* Empanelment of jury, Voir dire, Instructions to jury, Capital case. *Homicide. Self-Defense.*

In the course of jury selection for the trial of an indictment for murder in the first degree, a Superior Court judge did not commit reversible error by refusing to ask the venire whether they, or anyone in their family, had ever been the victim of a crime of violence. [735-738]

This court concluded that no view of the evidence at the trial of an indictment for murder in the first degree would support a reasonable inference that the victim had died as a result of a punch to the neck, and therefore, the Superior Court judge presiding at the trial properly refrained from instructing the jury on the use of nondeadly force in self-defense. [738-740]

INDICTMENT found and returned in the Superior Court Department on February 6, 2001.

The case was tried before *Richard F. Connon,* J.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree by reason of deliberate premeditation. Represented by new counsel, the defendant now argues that a new trial is required because the judge (1) refused to pose a collective question to the venire as to whether they, or a family member, had ever been a victim of a violent crime, and (2) failed to instruct the jury, sua sponte, on the use of nondeadly force in self-defense. We reject these arguments. We also conclude that there is no basis to exercise our power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the defendant's murder conviction to a lesser degree of guilt. Accordingly, we affirm the defendant's conviction.

The Commonwealth presented evidence at trial that permitted the jury to find the following facts. On the evening of December 9, 2000, the defendant and Deborah Pitts met outside a homeless shelter. At approximately 8 P.M., after collecting and cashing a check for $500 (payment for work the defendant had contracted to perform on Martha's Vineyard), the two checked into room 37 of the American Host Motel (motel) in Yarmouth. The defendant paid for the room for a week in advance with $200 in cash.

In the motel room, the defendant and Pitts talked, drank, engaged in consensual sexual intercourse, and fell asleep. Pitts awoke early the next morning and began drinking. The defendant wanted to have sex again, but Pitts refused and was able to calm the defendant when he became aggressive. Pitts fell back asleep and did not hear the defendant leave the room.

At approximately 1 or 1:30 P.M. on December 10, 2000, the defendant entered a liquor store, accompanied by the victim, David Bortnik. The defendant appeared to have been drinking but was not noticeably intoxicated. While the victim shopped, the defendant told the store clerk that he had paid for a motel room as a Christmas present for the victim. The defendant also stated that he was going to buy the victim "pretty much what he wanted" so that he (the victim) would not have to bother "rolling old people." The defendant told the store clerk, however, that if the victim tried to rob him, he (the defendant) would kill him. The defendant and the victim both laughed, and the store clerk did not perceive the statement as a threat. The defendant purchased vodka and beer. As the two men left the liquor store, the defendant reminded the victim that he would kill him if he "went after" the defendant's money. The victim just laughed.[1]

The defendant and the victim returned to the motel and told the desk clerk that they had been locked out of the defendant's room. The desk clerk, accompanied by the two men, knocked on the door to room 37 and, after Pitts opened the door, returned to the motel office. The defendant, the victim, and Pitts (who was a friend of the victim) began drinking. The defendant, who

---

[1] The encounter at the liquor store was recorded on videotape by the store's security system. The videotape was shown to the jury.

had initially been angry at Pitts for not letting him into the room, now appeared to be in a good mood. The defendant and the victim hugged each other and called each other "brother." The victim giggled and laughed and, according to Pitts, was his "happy-go-lucky self."

As the afternoon wore on, interaction between the defendant and the victim became testy. The defendant eventually fell asleep. Pitts then reached into his pockets. She removed his wallet and then $115.[2] Placing the wallet (which had contained no money) on the bed, and urging the victim to join her, Pitts left the room with the $115. The victim, who was laughing and clearly intoxicated,[3] followed but returned to the room to retrieve his shirt. Pitts never saw him again.

At approximately 7 P.M. that evening, the defendant appeared in the motel office. He told the desk clerk that he had received an emergency telephone call[4] and had to check out of the motel immediately. He asked the desk clerk to refund the money he had paid for the room. When informed that was impossible, the defendant responded that he would accept any amount of money. The desk clerk gave the defendant thirty dollars. At trial, the desk clerk described the defendant's demeanor as "real fidgety." After the defendant left, the desk clerk proceeded to room 37, where he discovered the victim's body. The body appeared to be unbruised, with the exception of red welts that encircled the neck area. Police officers subsequently recovered a wire coat hanger in the trees behind the motel, just below the window of room 37. The defendant was arrested the following morning at the home of friends in Hyannis.

In a statement to police, the defendant related the following version of events. According to the defendant, it was Pitts who

[2]Pitts testified under an agreement with the Commonwealth that allowed her to enter a plea of guilty to a charge of larceny in exchange for the Commonwealth's promise to recommend a suspended sentence and probation in connection with that charge. The defendant's trial counsel emphasized to the jury that Pitts's testimony was one of three different versions of her activities recounted at various times by Pitts to police officers.

[3]The medical examiner testified that the victim's blood alcohol level was .35 per cent, over four times the legal limit to operate a motor vehicle.

[4]The desk clerk testified that all telephone calls must go through the motel's main switchboard and that no telephone calls had been received by the switchboard that afternoon.

left the motel room on Sunday morning. The defendant went back to sleep, and when he awoke, the victim (who the defendant claimed weighed 300 pounds) and a younger male were holding him down on the bed. As the younger male fled with his wallet (which the defendant stated contained $400) and $100 that had been on the night stand, the victim held the defendant on the bed, punching him in the arms and legs. The defendant feigned unconsciousness. When the victim turned away, the defendant jumped up, and the victim "came at" the defendant. The defendant then punched the victim as hard as he could in the throat, and the victim collapsed. The defendant stated to police: "I killed him, but I did not strangle him." When confronted by police officers with the medical examiner's findings that the victim had, in fact, been strangled, the defendant speculated that someone else may have entered the motel room after he had left. He then conceded, however, that such a scenario was unlikely.

The Commonwealth proceeded against the defendant on theories of deliberate premeditation and extreme atrocity or cruelty (the latter theory was not selected by the jury on the verdict form). The medical examiner testified that the victim had died as a result of asphyxiation by ligature strangulation and testified that the ligature most likely was the wire coat hanger.[5] The crossed marks on the victim's neck corresponded with the shape of the coat hanger and, the medical examiner concluded, could only have been made if the assailant was standing behind the victim and holding the ligature from behind. Small pinpoint, or petechial, hemorrhages in the victim's eyes and airways indicated an asphyxial death and confirmed that the victim was alive at the time the ligature strangulation occurred. Deoxyribonucleic acid (DNA) testing of a bloodstain on the defendant's khaki pants and swabs taken from his left thumbnail, his right inside forearm, and his left sneaker revealed DNA consistent with the victim's.

The defendant did not testify. Through cross-examination of the Commonwealth's witnesses, and through witnesses of his

---

[5]On cross-examination, the medical examiner stated that it was possible that the victim had also received a blow to the neck, but steadfastly insisted the victim could only have died from strangulation.

own, the defendant's trial counsel presented evidence to support contentions that the killing occurred in the heat of passion or by the use of excessive force in self-defense, and further, that the defendant was intoxicated and debilitated due to chronic alcoholism at the time of the killing and, so, was incapable of premeditation.[6]

1. Pursuant to G. L. c. 234A, § 22, each member of the venire was required to complete and sign a confidential juror questionnaire that elicited information to be used by the judge and lawyers during empanelment of the jury. The questionnaire provided a space for each potential juror to "[d]escribe briefly any involvement (past or present) as a party or a victim in a civil or criminal case by you or any member of your immediate family." In the course of jury selection, the defendant's trial counsel requested that the judge inquire of the venire whether they, or anyone in their family, had ever been the victim of a crime of violence. The judge noted that the identical question had already been posed to prospective jurors by the confidential juror questionnaire. The defendant's trial counsel indicated that, in his experience, one or more jurors may have been a victim of a violent crime but, intentionally or inadvertently, neglected to include this information in the written responses to the questionnaire.[7] The judge denied the request, and the jury then were empanelled.

The defendant does not now claim, nor is there anything in the record to indicate, that the chosen jurors were less than fair and impartial. He argues only that the jury may have included members whose views were tainted by personal experiences with violent crime and that the judge's refusal to pose the requested question denied him the opportunity to probe for potential bias.

---

[6]We have not recounted other evidence presented by the defendant in connection with his contention that his alcoholism rendered him cognitively impaired at the time of the killing and, thus, incapable of premeditation. It is clear that the jury rejected the defendant's intoxication defense, and no claim is raised on appeal with respect to that issue.

[7]The record suggests that it was individual voir dire that was sought by the defendant's trial counsel. He stated: "I find, however — we've done a lot of these individual voir dires, and we often find that even though it's one of those three questions that they bring something up that they didn't . . . ."

The scope of voir dire rests in the sound discretion of the trial judge, and a determination by the judge that a jury are impartial will not be overturned on appeal in the absence of a clear showing of abuse of discretion or that the finding was clearly erroneous. See *Commonwealth* v. *Emerson*, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000). We reject the defendant's contention that the proper focus of our review is "whether the [questions] used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." *United States* v. *Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972), cert. denied, 410 U.S. 970 (1973). The goal of permitting questioning of prospective jurors is to provide a defendant with a competent, fair, and unbiased jury. A trial judge, who is aware of the facts of a particular case and can observe firsthand the demeanor of each prospective juror, is in the best position to determine what questions are necessary reasonably to ensure that a particular jury can weigh and view the evidence impartially.

Beyond those mandated by G. L. c. 234, § 28,[8] questions to be asked during voir dire are within the broad discretion of the judge, except when there exists a substantial risk of extraneous issues that might influence the jury. See *Commonwealth* v. *Morales*, *ante* 536, 548 (2003); *Commonwealth* v. *Ashman*, 430 Mass. 736, 739 (2000); *Commonwealth* v. *LaFaille*, 430 Mass. 44, 50-51 (1999); *Commonwealth* v. *Grice*, 410 Mass. 586, 588

---

[8]The first paragraph of G. L. c. 234, § 28, requires a judge, on request, to examine each prospective juror "to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein . . . . In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilty beyond a reasonable doubt, and that the defendant need not present evidence in his behalf."

The second paragraph of § 28 provides that "if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations . . . ."

(1991); *Commonwealth* v. *Mickel,* 401 Mass. 1003, 1004 (1987). This court has concluded that cases involving interracial murder, interracial rape, and sexual offenses against children where the victim and the defendant are of different races present, as a matter of law, a substantial risk that extraneous issues will likely influence prospective jurors, and in such cases, individual questioning with respect to racial prejudice, on request, is mandatory. See *Commonwealth* v. *Young,* 401 Mass. 390, 398 (1987), overruled in part on another ground in *Commonwealth* v. *Ramirez,* 407 Mass. 553, 555 (1990) (interracial murder); *Commonwealth* v. *Sanders,* 383 Mass. 637, 640-641 (1981), overruled in part on another ground in *Commonwealth* v. *Ramirez, supra* (interracial rape); *Commonwealth* v. *Hobbs,* 385 Mass. 863, 873 (1982) (interracial sexual offenses against children). A judge is also required, on request, to question prospective jurors individually for bias in cases involving sexual offenses against minors, see *Commonwealth* v. *Flebotte,* 417 Mass. 348, 355 (1994), and in cases involving the insanity defense, see *Commonwealth* v. *Seguin,* 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996). None of these situations is present here. That being said, in view of the violent nature of the charge of murder, it would have been preferable had the judge asked the venire collectively whether any of the prospective jurors, or a member of their immediate family, had ever been the victim of a violent crime.[9] A single collective question would have provided an opportunity for any juror to reveal a previously undisclosed experience that might have affected his or her impartiality. We would expect judges to ask the question in cases of violent crime. We do not consider the time it might take particularly to inquire further to assess bias on the part of prospective jurors who respond positively as persuasive justification to forgo the practice. There is nothing in

---

[9]We note that, although not required, it has long been common practice to do so on request. See, e.g., *Commonwealth* v. *Sanchez,* 423 Mass. 591, 593-594 (1996); *Commonwealth* v. *Valentin,* 420 Mass. 263, 268 n.5 (1995); *Commonwealth* v. *Cassidy,* 410 Mass. 174, 175 (1991); *Commonwealth* v. *Pope,* 392 Mass. 493, 505 n.15 (1984); *Commonwealth* v. *Nickerson,* 388 Mass. 246, 248 (1983); *Commonwealth* v. *Core,* 370 Mass. 369, 373 (1976).

our statutes or case law, however, to suggest that the judge committed reversible error by refusing to ask the requested question.[10]

The panel was sufficiently advised as to the nature of the case and the charge against the defendant. The judge explained in detail the importance of being aware of factors that could affect a juror's impartiality, such as: pretrial publicity; a relationship with a prospective witness; the fact that the defendant had been indicted or held in custody; and the credibility of police officers as compared to lay witnesses. The judge carefully instructed prospective jurors to examine their consciences as to whether they were free from bias or prejudice. The judge then asked the group to respond by a show of hands if any prospective juror felt that he or she could not be impartial.[11] We also note that the defendant's trial counsel, who was given the opportunity to examine the answers on the juror questionnaires, gave no indication to the judge that any of the jurors ultimately selected for service had not answered, or had given a possibly questionable answer to, the question about involvement as a party or a victim in a prior civil or criminal case. We give deference to the judge's determination that the chosen jurors were fair and impartial. The defendant's allegation that the case could have been decided on prejudice harbored by one or more jurors provides no basis for overturning the judge's decision. See *Commonwealth* v. *Mahoney*, 406 Mass. 843, 850-851 (1990); *Commonwealth* v. *Sheline*, 391 Mass. 279, 291 (1984).[12]

2. The contested issue at trial was whether the defendant

---

[10]We reject the defendant's suggestion that the language or the legislative history of G. L. c. 234A, § 22, providing for a confidential juror questionnaire that elicits, among other things, information from the venire as to "present or past involvement as a party to civil or criminal litigation," demonstrates an intention of the Legislature to require judges specifically to ask a similar question during voir dire. The controlling statute for purposes of the scope of voir dire is G. L. c. 234, § 28. As we have noted, the confidential jury questionnaire used in this case went further than the language of the statute by requiring prospective jurors to respond to the following question: "Describe briefly any involvement (past or present) as a party or a victim in a civil or criminal case by you or any member of your immediate family."

[11]At this point one prospective juror came forward and indicated that he could not be impartial because his daughter had recently been the victim of a larceny. The judge excused him.

[12]We acknowledge appellate decisions from other jurisdictions, cited by the defendant, reversing convictions on the ground that the trial judge had denied

killed the victim intentionally, as the Commonwealth claimed, or whether, as the defendant claimed, he killed the victim, while intoxicated, in the heat of passion or in self-defense during a struggle following the victim's robbery of the defendant. The judge instructed the jury substantially in accordance with the defendant's requested instructions on the proper use of deadly force in self-defense. The instructions on self-defense with deadly force and on the issues of provocation and killing committed in the heat of passion were comprehensive and correct. The defendant made no request for an instruction on the use of nondeadly force in self-defense. The defendant now claims that the judge's failure so to instruct, sua sponte, was error. We review the claim to see whether error existed and, if so, whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Nunes*, 430 Mass. 1, 4 (1999). "The proper standard for determining whether a defendant's particular actions were justifiably undertaken in self-defense depends on the level of force he used on his victim and the circumstances that prompted those actions." *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998). While the right to use deadly force arises only when the defendant reasonably and actually believes that he is in "imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force," *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980), the use of nondeadly force is justified at a lower level of danger, in circumstances giving rise to a "reasonable concern over his personal safety." *Commonwealth* v. *Baseler*, 419 Mass. 500, 502-503 (1995). The use of one's fists is considered to be nondeadly force, even if a death results. See *Commonwealth* v. *Noble*, 429 Mass. 44, 46 (1999). The defendant claims that the judge's explanation of self-defense solely in terms of the use of deadly force undermined a substantial part of his claim of self-defense, because it removed from the jurors' consideration the

the defendant's request to inquire into jurors' past victimization by violent crimes or of crimes similar to those of which the defendant was accused. See *United States* v. *Shavers*, 615 F.2d 266, 268 (5th Cir. 1980); *United States* v. *Poole*, 450 F.2d 1082, 1083-1084 (3d Cir. 1971); *Commonwealth* v. *Fulton*, 271 Pa. Super. 430, 433 (1979). We are unable to conclude in this case, however, that the judge's failure to pose the requested question constituted error.

issue whether he had punched the victim in response to a reasonable fear for his safety.

A defendant is entitled to an instruction on the use of nondeadly force if any view of the evidence, regardless of the credibility, and resolving all reasonable inferences in favor of the defendant, would support a finding that nondeadly force was, in fact, used in self-defense. See *Commonwealth* v. *Pike, supra.* Here, the Commonwealth, through forensic evidence and testimony of the medical examiner, presented evidence that left no reasonable doubt that the victim died as a result of asphyxiation by ligature strangulation. The defendant presented no evidence to the contrary. Indeed, although he stated to police that he killed the victim by punching him in the neck, he subsequently appeared to concede that strangulation was the actual cause of death when he suggested to police that someone else may have entered the motel room after he had left. Significantly, even the defendant agreed that the latter was unlikely. We conclude that no view of the evidence would support a reasonable inference that the victim had died as a result of a punch to the neck. The jury were properly instructed on the issue of self-defense.[13]

3. We have examined the record pursuant to our obligation under G. L. c. 278, § 33E. There is no basis on which to grant the defendant relief.

*Judgment affirmed.*

---

[13]Even assuming that the defendant was entitled to an instruction on the use of nondeadly force in self-defense, we have no serious doubt that had the instruction been included, the result of the trial would have been the same. See *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999).