## COMMONWEALTH *vs.* AGAPITO LAO.

Suffolk. February 11, 2005. - March 31, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Voir dire, Required finding.

A judge did not abuse his discretion in refusing to conduct an individual voir dire of potential jurors during the empanelment process preceding the trial of an indictment of murder in the first degree, where neither statute nor case law mandated individual questioning of potential jurors in the circumstances of the case. [775-778]

The judge at the trial of an indictment of murder in the first degree properly denied the defendant's motions for a required finding of not guilty pursuant to Mass. R. Crim. P. 25, where, although the evidence was wholly circumstantial, it was sufficient to warrant the jury's conclusion that the defendant killed the victim and that he did so with deliberate premeditation and malice. [778-780]

INDICTMENT found and returned in the Superior Court Department on June 26, 2000.

The case was tried before *Patrick F. Brady,* J.

*Roger A. Cox* for the defendant.

*John P. Zanini,* Assistant District Attorney, for the Commonwealth.

SPINA, J. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of deliberate premeditation for the strangulation death of his estranged wife. Represented by new counsel, he now contends that the judge erred in (1) failing to conduct an individual voir dire of potential jurors as to the issue of domestic violence; and (2) denying his motions for a required finding of not guilty. We affirm the defendant's conviction and conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his conviction to a lesser degree of guilt or order a new trial.

1. *Background.* The defendant and his wife, Alicia, were separated and had been living apart for approximately one and

one-half years before her murder. During their marriage, the
defendant had not allowed Alicia to invite friends to their house,
had eavesdropped on her telephone conversations, had wanted
to be paged when she left the house and again when she arrived
at her destination, had argued with her about visits from her
relatives, and had not wanted her to obtain a driver's license.
After the defendant moved out of the marital home on the third
floor of 122 Bellingham Street in Chelsea, he still visited every
other day, even though the locks had been changed, and drove
Alicia from place to place. The defendant and Alicia continued
to argue, often about her telephone calls, and then went about
their business as if nothing had happened.

On the evening of April 30, 2000, the defendant and Alicia
went out to dinner, purportedly to discuss their divorce and the
fact that Alicia's boy friend would be moving in with her the
next day. When she returned home, Alicia was crying, scared,
and upset, telling her teenage daughter, Yessenia, that when the
defendant dropped her off, he had tried to run her over with his
car. Still crying, Alicia paged the defendant several times. When
he answered her page, Alicia asked the defendant why he had
tried to run her over, and she threatened to kill him.[1] After the
defendant hung up on her, Alicia paged him several more times,
but he did not respond. Still upset, Alicia telephoned her mother
and recounted what just had happened with the defendant. Alicia
then telephoned the police. When the police responded, she still
was crying, nervous, and upset. Alicia explained to Officer
Eugene Bonita the events that had transpired that evening. Of-
ficer Bonita advised Alicia of the process for obtaining a protec-
tive order, but she declined to pursue that avenue and said that
she would telephone if she needed further police assistance. The
defendant later denied to the police that he had argued with
Alicia about their divorce, or that he had attempted to run over
Alicia with his car.

During the evening of May 1, 2000, Alicia's boy friend, Ra-
mon Rodriguez, arrived at her home from New York City. At
approximately 8 A.M. the next morning, he left the apartment to
apply for a job at Massachusetts General Hospital (MGH),

---

[1] Over the years, Alicia had suffered from mental illness, which had neces-
sitated medication and periodic hospitalizations.

where he once had been employed. Yessenia had given Rodriguez her keys so that he could get back into the apartment. Roberta Keogh, an MGH employee, remembered seeing Rodriguez at approximately 9 A.M. and observed him filling out an application for a janitorial position. Rodriguez spent twenty to twenty-five minutes completing the application. Then, he spoke with a few old friends on his way out of MGH and took a bus back to Alicia's apartment.

Meanwhile, back in Chelsea, Millie Guzman, who lived in the apartment below Alicia's, was awakened by the sounds of Alicia screaming and of a struggle coming from that apartment, including pounding noises.[2] At about the same time, she heard her father, Francisco Guzman, unlock the front door and go outside to start his tow truck. According to Guzman, he left the apartment about 9 or 9:15 A.M. and locked the back door of the apartment building behind him. When Guzman returned to the apartment approximately ten minutes later, the screaming had stopped.[3]

When Rodriguez arrived back at Alicia's apartment from MGH, he entered and found Alicia lying unconscious across the bed surrounded by blood. He immediately telephoned 911 (at approximately 10:13 A.M.), tried to administer cardiopulmonary resuscitation (CPR), and waited for the police. Within minutes, emergency personnel arrived at the scene. When Rodriguez met them on the landing of the third-floor apartment, he was holding a baseball bat that he had grabbed in case Alicia's attacker was still inside the apartment. Police witnesses testified that Rodriguez was shaking and looked "scared and afraid and excited" when they first saw him. Rodriguez directed the police to Alicia's bedroom, where she was lying unconscious, face up,

[2]On cross-examination, Millie Guzman's testimony that she had been awakened on the morning of May 2 by a bang from Alicia's apartment was impeached with her grand jury testimony. Before the grand jury, she had testified that she was awake and watching a television program, "A Different World," that aired at 8 A.M. and again at 8:30 A.M. On cross-examination, Millie stated that she left the television on the entire night and that she did not remember what time she woke up, but that she would usually watch "A Different World" in the morning.

[3]Millie was unable to telephone 911 in response to the screaming because the family's telephones had been locked away to prevent Millie's brother from making long-distance telephone calls.

with her feet on the floor. She was holding a telephone in her left hand, her left arm had been lacerated, blood was on the pillow underneath her arm, and she had visible bruises on her neck. Emergency personnel performed CPR, and Alicia was taken to a hospital where she survived in the intensive care unit for nearly two weeks with no brain activity. She was pronounced dead on May 17, 2000.

Between 9 and 9:30 A.M. on May 2, 2000, Jose Santiago and his brother, Carlos Merced, were examining and repairing a tire on a car parked near Alicia's home at 122 Bellingham Street. Santiago's former wife and children lived in an apartment at that address, and he had driven over to pay the rent to his wife's landlord, Francisco Guzman. As Santiago walked to the back of the house, he passed the defendant, whom he had known for several years, and who was walking down the driveway away from the house in the direction of the street. The two men greeted each other, and Santiago stated that the defendant looked a little nervous. The defendant was wearing a sweater with a hood covering his head; he was also wearing gloves. When Santiago reached the rear of the house, he noticed that the back door was open. Concerned for his daughters, Santiago asked Guzman why he had left the door open, to which Guzman replied that he had just locked the door. Santiago then told Guzman, "Well, it must be [the defendant] because I saw him go by the driveway. I bumped into him." Not sure of the exact time of this encounter, Santiago estimated that he saw the defendant approximately thirty minutes before the police arrived. A neighbor, Natalie Ramos, observed Santiago speaking with Guzman around 9:20 A.M. Later that day, Santiago identified the defendant from a photographic array as the man that he had greeted that morning as the man walked down the driveway.

Later that same day, at approximately 2:30 P.M., the police stopped the defendant on Northampton Street in Boston, which was near his home. He was driving a white van. The defendant voluntarily went to the police station where, after receiving the Miranda warnings, he answered all questions posed by the police, and he denied being anywhere in the vicinity of Alicia's apartment that morning. Instead, he claimed that he left his home around 8 A.M. and went to the South Bay Home Depot

store to purchase a door for a job that he had in Waltham, at the home of Yolanda Louis. A store videotape showed that, at approximately 8:50 A.M. on May 2, an individual purchased the specific type of door that was installed at Louis's home and wheeled it out of the store.[4] A receipt for this purchase, also indicating that the door had been purchased at 8:50 A.M. on May 2, was found in the defendant's van. A videotape showed a van in the parking lot of the Home Depot on that date that the police believed belonged to the defendant. Afterward, the defendant claimed that he had breakfast at a McDonald's restaurant in the East Boston section of Boston. At approximately 9:15 A.M., the defendant alleged that he telephoned Alicia from a nearby public telephone, spoke with her briefly about medical test results, drove to Waltham, arrived there about 10:30 A.M., and worked on installing the door until 2 P.M.

According to Yolanda Louis, she was not at home during the time that the defendant installed the door. However, when she paged him at 1 P.M. to inquire if the door had been installed, the defendant told Louis that he was at the Home Depot store in Waltham picking up the door. When Louis arrived home later in the afternoon, the project had been completed, although the defendant had hung the new door on the old frame, rather than replacing the entire frame as Louis had expected. A postal route inspector, who had been tracking the delivery route in Louis's neighborhood, walked by her home around 10:35 A.M. and did not observe anyone working on the front or side of the house. However, Virginia Valverde, who rented the second floor of Louis's home, remembered hearing someone working around 10:30 A.M. on the day of the murder. She did not see who was making the noise. When Valverde got out of bed thirty to forty-five minutes later, she saw a white van parked outside the house. It was the same van that had been parked at the house when other work had been performed by the defendant, and it was gone when Valverde left for work around 3:40 P.M.

When the police investigated the crime scene, they found no

---

[4] A witness for the defense, Miguel Santiago, who lived in the same house on Camden Street in Boston where the defendant had been living, testified on cross-examination that the drive from the South Bay Home Depot store to Chelsea in morning rush hour traffic could take anywhere from twenty minutes to one hour.

signs of forced entry, the locks were not broken, and nothing was amiss inside the apartment, except for a knocked over ashtray in the bedroom. The police discovered bloodstains only in the bedroom where Alicia's body was found. There were no fingerprints that could be lifted, and the footwear impressions taken by the police did not match any footwear taken from the defendant. Tests performed on the defendant's jacket, hat, gloves, and cellular telephone, all recovered from his van, and on the van itself, did not detect any blood. No testing was performed on a hair that had been found on Alicia's right clavicle, or on the baseball bat that Rodriguez had been holding when the police arrived at the apartment.

The medical examiner, Dr. William Zane, opined that Alicia's injuries were consistent with someone's hands gripping and applying pressure around her neck. On May 18, 2000, Dr. Alexander Cherkov, a forensic pathologist, performed an autopsy on Alicia's body. He determined her cause of death to be "anoxic encephalopathy," meaning that Alicia's brain had been destroyed by the absence of oxygen caused by strangulation. In his opinion, none of Alicia's injuries was consistent with having been struck by a baseball bat.

2. *Voir dire*. Prior to trial, the defendant moved for individual voir dire to determine whether any of the prospective jurors, or their relatives or close friends, ever had been in an abusive relationship and whether they would be able to render a fair and impartial verdict.[5] Stating that the circumstances of this case did not fit within any of those categories of cases that require individual voir dire, the judge denied the defendant's motion, but he agreed to make clear the nature of the charge against the defendant and to specify that if any jurors were uncertain about their ability to be fair and impartial, they should speak with the judge at sidebar.

When the judge started the empanelment process, he advised the prospective jurors that the victim had been the defendant's wife. The judge then asked them collectively, inter alia, whether they were aware of any bias or prejudice for or against

---

[5]We note that, in his brief, the defendant contends that there was no evidence that he had physically abused Alicia at any time during their marriage or separation.

either the Commonwealth or the defendant and whether they knew of any reason whatsoever why they could not be impartial and render a true and just verdict based only on the evidence and the law as explained by the judge. A number of potential jurors spoke with the judge and counsel at sidebar, explained their concerns about their ability to be impartial in a case purportedly involving domestic abuse, and were excused.

After the first witness had testified, juror no. 2 notified the judge that she had not mentioned her domestic violence experience during jury selection because she erroneously had thought that she would be eliminated based on the fact that she was studying for the bar examination. After determining that juror no. 2 had not discussed her situation with anyone else on the jury, the judge excused her. The defendant's request for a mistrial was denied. Later that same day, juror no. 15 notified the judge that, the previous night, she had dreamed that the defendant had beaten her sister, who had been a victim of domestic violence in the past. The judge was not entirely convinced of juror no. 15's veracity, noting that she already had tried to get excused from jury duty because it conflicted with a scheduled vacation. Nonetheless, after determining that juror no. 15 had not discussed her dream with any other jurors, the judge dismissed her. The defendant's request for a mistrial was again denied. The defendant now claims that this sequence of events demonstrated the highly charged nature of the crime alleged, and the potentially severe prejudice to him resulting from jurors who harbored significant emotional burdens with respect to domestic violence. The defendant asserts that individual voir dire on this issue was critical to preserving the jury's impartiality, and that the judge's failure to proceed in such a manner during the empanelment process constituted error. We disagree.

"The scope of voir dire rests in the sound discretion of the trial judge, and a determination by the judge that a jury are impartial will not be overturned on appeal in the absence of a clear showing of abuse of discretion or that the finding was clearly erroneous." *Commonwealth* v. *Lopes*, 440 Mass. 731, 736 (2004). "The goal of permitting questioning of prospective jurors is to provide a defendant with a competent, fair, and unbiased jury. A trial judge, who is aware of the facts of a

particular case and can observe firsthand the demeanor of each prospective juror, is in the best position to determine what questions are necessary reasonably to ensure that a particular jury can weigh and view the evidence impartially." *Id.*

"Beyond those mandated by G. L. c. 234, § 28,[6] questions to be asked during voir dire are within the broad discretion of the judge, except when there exists a substantial risk of extraneous issues that might influence the jury." *Id.* See *Commonwealth* v. *Morales*, 440 Mass. 536, 548-549 (2003); *Commonwealth* v. *Kater*, 432 Mass. 404, 413-414 (2000); *Commonwealth* v. *Ashman*, 430 Mass. 736, 739 (2000). "This court has concluded that cases involving interracial murder, interracial rape, and sexual offenses against children where the victim and the defendant are of different races present, as a matter of law, a substantial risk that extraneous issues will likely influence prospective jurors, and in such cases, individual questioning with respect to racial prejudice, on request, is mandatory." *Commonwealth* v. *Lopes, supra* at 737. See *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987), overruled in part on another ground in *Commonwealth* v. *Ramirez*, 407 Mass. 553, 555 (1990) (interracial murder); *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981), overruled in part on another ground in *Commonwealth* v. *Ramirez, supra* (interracial rape); *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982) (interracial sexual offenses against children). "A judge is also required, on request, to question prospective jurors individually for bias in cases involving sexual offenses against minors, see *Com-*

---

[6]The first paragraph of G. L. c. 234, § 28, requires that a judge, on request, examine each prospective juror "to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein . . . . In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf." The second paragraph of § 28 provides that "if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall . . . examine the juror specifically with respect to such considerations."

monwealth v. *Flebotte*, 417 Mass. 348, 355 (1994), and in cases involving the insanity defense, see *Commonwealth* v. *Seguin*, 421 Mass. 243, 249 (1995), cert. denied, 516 U.S. 1180 (1996)." *Commonwealth* v. *Lopes, supra.* The present case does not involve any of these circumstances, and we decline to expand the categories of cases for which individual voir dire is mandatory.

Where, as here, neither statute nor case law mandates individual questioning on voir dire, we defer "to the judge's determination that the chosen jurors were fair and impartial." *Id.* at 738. A number of the potential jurors spoke with the judge at sidebar, explained their concerns about their ability to be impartial, and were excused. Nothing in the record suggests that any of the remaining jurors were less than fair and impartial. We conclude that the judge did not abuse his discretion in refusing to conduct an individual voir dire of the potential jurors.

3. *Motions for required finding of not guilty.* At the close of the Commonwealth's case, and then again at the close of all of the evidence, defense counsel moved for a required finding of not guilty pursuant to Mass. R. Crim. P. 25, as amended, 420 Mass. 1502 (1995). The defendant now contends that the judge's denial of both motions was error. He asserts that the Commonwealth's case was based entirely on Santiago's identification testimony that he saw and greeted the defendant as the defendant was walking down the driveway of 122 Bellingham Street on the morning of May 2, and on the resulting inference that, just prior to that time, the defendant must have gone into the building, climbed to the third floor, strangled Alicia, and then left. The defendant points out that there was no forensic evidence connecting him to the crime and that the Commonwealth's evidence of motive was thin, particularly where there was no indication that the defendant had physically abused Alicia during their marriage or separation and where the defendant was already aware of his imminent divorce and of Alicia's relationship with Rodriguez. Moreover, the defendant contends that the events of April 30, when Alicia returned from her evening out with him, were wholly uncorroborated and dubious, especially when viewed in light of her history of serious mental illness.

It is well established that, on review, this court must determine "whether the evidence offered by the Commonwealth, together with reasonable inferences therefrom, when viewed in its light most favorable to the Commonwealth, was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime charged." *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979). "The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable . . . ." *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth* v. *Giang*, 402 Mass. 604, 609 (1988), quoting *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32 (1976). A conviction may not rest on the piling of inference upon inference or on conjecture and speculation. See *Commonwealth* v. *Swafford*, 441 Mass. 329, 339-343 (2004). However, the evidence of a defendant's guilt may be primarily or entirely circumstantial. See *Corson* v. *Commonwealth*, 428 Mass. 193, 197 (1998); *Commonwealth* v. *Donovan*, 395 Mass. 20, 25 (1985). The jury "may consider circumstantial evidence of guilt together with inferences drawn therefrom that appear reasonable and not overly remote." *Commonwealth* v. *Andrews*, 427 Mass. 434, 440 (1998). If, from the evidence, conflicting inferences are possible, it is for the jury to determine where the truth lies, for the weight and credibility of the evidence is wholly within their province. See *Cramer* v. *Commonwealth*, 419 Mass. 106, 110, 111 n.2 (1994).

Under the theory of murder presented at trial, the Commonwealth was required to prove that the defendant unlawfully killed his estranged wife with malice aforethought and deliberate premeditation. See *Commonwealth* v. *LaCava*, 438 Mass. 708, 717 (2003); *Commonwealth* v. *Coleman*, 434 Mass. 165, 167 (2001). We reject the defendant's challenge to the sufficiency of the evidence. Dr. Cherkov, the forensic pathologist, opined that Alicia's death was caused by a lack of oxygen to her brain resulting from manual strangulation for between thirty seconds and five minutes. Such evidence supported the infer-

ence that Alicia's death was not instantaneous but was the result of sustained pressure on her neck. See *Commonwealth* v. *Serino*, 436 Mass. 408, 411 (2002) (evidence of death by manual strangulation sufficient to establish malice and deliberate premeditation). Moreover, Millie Guzman testified that she heard a banging noise coming from Alicia's apartment, the sound of someone struggling, and Alicia screaming for approximately ten minutes.

There was evidence that the defendant had a motive to kill his estranged wife, namely the termination of their marriage and Alicia's new relationship with Rodriguez. Santiago identified the defendant, whom he had known for several years, outside 122 Bellingham Street around the approximate time of the murder. Any weaknesses in this identification were for the jury to weigh, and did not constitute grounds for a required finding of not guilty. See *Commonwealth* v. *James*, 424 Mass. 770, 785 (1997). See also *Commonwealth* v. *Warren*, 403 Mass. 137, 140 (1988).

The fact that the defendant presented evidence that he had purchased a door from the South Bay Home Depot store at 8:50 A.M. on May 2 was not uncontroverted proof that he could not have returned to Chelsea immediately after making that purchase and killed Alicia. Moreover, the fact that the defendant presented possible alternative perpetrators of Alicia's murder is not dispositive because "[t]he Commonwealth need not show that no other person could have committed the crime." *Commonwealth* v. *Lodge*, 431 Mass. 461, 466 (2000). See *Commonwealth* v. *Farley, ante* 740, 745-746 (2005). That another individual "may have had the opportunity to commit the crime goes only to the weight of the evidence, which is an issue for the jury." *Cramer* v. *Commonwealth, supra* at 112. A jury are not required to believe a defendant's evidence, even where there are inconsistencies and discrepancies in the testimony of various witnesses. See *Commonwealth* v. *Maia*, 429 Mass. 585, 588-589 & n.5 (1999). See also *Commonwealth* v. *Ruci*, 409 Mass. 94, 97 (1991) (inconsistent testimony does not render evidence insufficient). Although the evidence here was wholly circumstantial, we conclude that it was sufficient to warrant the jury's conclusion that the defendant killed Alicia and that he did so with deliberate premeditation and malice.

4. *Review under G. L. c. 278, § 33E.* Having reviewed the entire record as required by G. L. c. 278, § 33E, we conclude that there is no reason to exercise our power to reduce the jury's murder verdict or order a new trial. See *Commonwealth v. Jefferson*, 416 Mass. 258, 265-267 (1993).

*Judgment affirmed.*