NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11951

COMMONWEALTH  vs.  JOSE TEJADA.


Essex.     October 7, 2019. - January 23, 2020.

Present:  Gants, C.J., Lenk, Lowy, Budd, & Kafker, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
    Voluntariness of statement.  Evidence, Admissions and
    confessions, Voluntariness of statement.  Practice,
    Criminal, Capital case, Motion to suppress, Admissions and
    confessions, Voluntariness of statement, Voir dire,
    Empanelment of jury.



    Indictments found and returned in the Superior Court
Department on December 28, 2011.

    A pretrial motion to suppress evidence was heard by Mary K.
Ames, J., and the cases were tried before Howard J. Whitehead,
J.


    David H. Mirsky (Joanne T. Petito also present) for the
defendant.
    David F. O'Sullivan, Assistant District Attorney, for the
Commonwealth.


    LENK, J.  The defendant was convicted of three counts of

murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty.  On appeal, he

argues that (1) there was insufficient evidence to sustain his convictions; (2) his statements to police on the night of his arrest should have been suppressed; and (3) the trial judge erred by declining to ask a requested question about anti-Hispanic juror bias during voir dire.  Separately, the defendant asks us to order a new trial or to reduce the degree of guilt pursuant to G. L. c. 278, § 33E.  We affirm the convictions and decline to exercise our powers under G. L. c. 278, § 33E, to grant the requested relief.

Background.  We recite the facts as the jury could have found them, reserving certain details for subsequent discussion.  In the early morning hours of September 5, 2011, Lawrence police arrested the defendant after he said that he had killed his wife and her two teenage children.  At approximately 2 A.M. that morning, a neighbor was returning home with his family when the defendant approached him in a parking lot and asked to be taken to the police station because "he had just killed three people."  The neighbor (who did not know the defendant) agreed to telephone the police, and waited with the defendant until they arrived.  When the neighbor asked the defendant what had happened, the defendant responded that he had killed his family because they were "talking down to him."  The neighbor was unsure whether to believe the defendant, who was shaking and whose eyes were "bugging out."

When the police arrived, the neighbor remained to translate for the defendant, whose native language is Spanish and who did not speak English. Police asked the defendant what had happened; through the neighbor's efforts at translation, the defendant repeated the substance of what he had told the neighbor, and provided an address to a nearby apartment building where he said the shootings had taken place. He also told the officers that he had tried to shoot himself, but had run out of bullets. When officers asked the defendant what he had done with the weapon, the defendant told them that he had discarded it after leaving the house to go for a walk. Although the defendant seemed anxious, he was cooperative and calm, and he maintained an even tone throughout the conversation.

Officers eventually decided to investigate the accuracy of the defendant's statements; they pat frisked and handcuffed him, placed him in the back seat of a police cruiser, and drove the few blocks to the address the defendant had provided. After knocking on the apartment door and receiving no response, police broke down the door. Inside the apartment, they found the three victims, all deceased, in an upstairs bedroom.

Police recovered a variety of forensic evidence from the scene and the defendant's person. First, officers observed bloody footprints on the stairs, going through the kitchen, and heading toward the back door; forensic analysis later determined

that the footprints were consistent with the type of shoes the defendant had been wearing.[1]  In addition, the defendant's hands tested positive for gunshot residue, and there were traces of the victims' blood on the defendant's clothing.  In the grass behind the apartment building, police found a revolver containing six spent shell casings that matched bullets recovered from the scene.  The revolver had traces of blood on it from at least two people.  The defendant's wife's blood matched the major female profile.

Prior proceedings.  Before trial, the defendant moved to suppress his statements to police.  The motion was denied with respect to the defendant's statements while he was seated on the curb speaking with police; the motion was allowed with respect to statements made once the defendant was handcuffed and seated in the police cruiser.

Following the partial denial of the defendant's motion to suppress, a Superior Court jury convicted him of three counts of

---

[1] At trial, a forensic analyst described the defendant's shoes as a "class match" for the footprints found at the scene. The analyst explained that a "class match" means that the defendant's shoes shared features such as size, design features, and wear with the footprints recovered at the scene.  Although a "class match" is not a conclusive determination that only a particular shoe could have left the footprints, the analyst stated that a class match still has "great significance."

murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.

Discussion.  On appeal, the defendant argues that there was insufficient evidence to sustain his convictions of murder in the first degree.  The defendant contends also that his motion to suppress should have been allowed, because his statements to police were inadmissible as the product of a custodial interrogation where no Miranda warnings were given, and because his statements to police were involuntary.  He argues further that the judge's decision not to ask the venire a requested question concerning juror bias constituted reversible error.  In addition, the defendant asks that we exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or to order a new trial pursuant to our authority under G. L. c. 278, § 33E.

1.  Sufficiency of the evidence.  The defendant argues that there was insufficient evidence to convict him of murder in the first degree under either a theory of deliberate premeditation or a theory of extreme atrocity or cruelty.  Where, as here, a trial judge denies a defendant's motion for a required finding, we view the evidence in the light most favorable to the Commonwealth and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted).  Commonwealth v. Latimore,

378 Mass. 671, 677 (1979). As long as there is sufficient evidence of one theory, the convictions remain undisturbed on appeal. See Commonwealth v. Nolin, 448 Mass. 207, 220 (2007).

We turn to consider whether there was sufficient evidence to establish murder in the first degree on a theory of deliberate premeditation.[2] To sustain the convictions under this theory, the Commonwealth was required to prove that the defendant (1) caused the death of the victims; (2) intended to kill the victims; and (3) acted with deliberate premeditation. See Model Jury Instructions on Homicide 44 (2018); Model Jury Instructions on Homicide 37 (2013). As there is no claim that the defendant did not cause the death of the victims, what remains is to consider whether the defendant intended to kill them, and whether he acted with deliberate premeditation.

The defendant's neighbor testified that the defendant told him that he had shot the victims because he had grown tired of them "talking down to him." Another witness testified that the defendant and his wife had argued in the hours prior to her

---

[2] Because we conclude, see infra, that there was sufficient evidence to establish deliberate premeditation, we need not address whether there was sufficient evidence to establish extreme atrocity or cruelty. See Commonwealth v. Smith, 459 Mass. 538, 548 (2011); Commonwealth v. Freeman, 430 Mass. 111, 123 (1999); Commonwealth v. Chipman, 418 Mass. 262, 270 n.5 (1994).

death, when she insisted on taking the defendant's keys to prevent him from drinking and driving. The jury also heard evidence that the victims were shot at close range, and that the victims were found lying in close proximity to one another, in a single bedroom.[3]

To establish the intent to kill, the Commonwealth must prove that the defendant "consciously and purposefully intended" to kill the victims. See Model Jury Instructions on Homicide, supra at 44; Model Jury Instructions on Homicide, supra at 37. Here, the jury could infer from the neighbor's testimony that the defendant shot his family because he had grown tired of them criticizing him or "talking down to him." Moreover, as we previously have held, the use of a firearm at close range provides strong evidence of an intent to kill. See Commonwealth v. Andrews, 427 Mass. 434, 440 (1998) (shooting victim at close range warranted finding of intent to kill). Thus, the evidence was sufficient to establish that the defendant intended to kill his victims.

---

[3] The Commonwealth acknowledges that a subsequent review of the forensic analysis indicated that the expert opinion estimating that the shots were fired from between three and nine inches away was inaccurate, and that a proper estimate would have been between three and twenty-four inches. Even absent this specific testimony, however, independent evidence that the gunshot wounds contained markings consistent with close- or intermediate-range gunfire was sufficient for the jury to conclude that the victims had been shot at close range.

The defendant contends, however, relying upon Commonwealth v. Mills, 400 Mass. 626, 627 (1987), that the evidence was insufficient because his intoxication and his mental state indicate that he lacked the mental capacity to form the intent to kill. The defendant's reliance on Mills is misplaced. Unlike Mills, supra, where the defendant sought, and was denied, an instruction on criminal responsibility, the defendant in this case did not pursue a defense of criminal responsibility or diminished capacity, nor did he seek an instruction on criminal responsibility.[4] Compare id. at 627, 630.

Moreover, the jury in fact were instructed to consider whether the defendant's intoxication and his mental state would have prevented him from forming the intent to kill. See Commonwealth v. Grey, 399 Mass. 469, 470-471 (1987) (evidence of intoxication and mental impairment relevant to question whether defendant formed intent to kill); Commonwealth v. Henson, 394

---

[4] Although we have not required a judge to instruct on criminal responsibility absent a request, see Commonwealth v. Genius, 387 Mass. 695, 697-699 (1982), we have concluded that, in limited circumstances, evidence of intoxication or mental impairment may be so severe as to warrant a reduction in the verdict pursuant to G. L. c. 278, § 33E, where no instruction on the effect of intoxication was requested or given. See Commonwealth v. King, 374 Mass. 501, 507-508 (1978). As discussed, see note 5, infra, in this case the conflicting evidence of the defendant's intoxication is insufficient to warrant relief under G. L. c. 278, § 33E.

Mass. 584, 592 (1985) (if there is evidence that defendant was under influence of alcohol or drugs at time of crime, judge should instruct jury to consider that evidence on question whether Commonwealth has proved specific intent beyond reasonable doubt).  While there was conflicting evidence as to the defendant's condition, the jury were free to weigh that evidence as they saw fit.[5]  See Commonwealth v. Vasquez, 419 Mass. 350, 352-353 (1995) (specific intent to kill, as demonstrated by defendant's repeated infliction of serious injuries, was not negated by evidence of voluntary intoxication).  Notwithstanding the evidence of the defendant's intoxication, the jury could have concluded that the defendant's statements and his use of a firearm at close range established an intent to kill.

To establish that a defendant acted with deliberate premeditation, the Commonwealth must show that "the plan to kill was formed after deliberation and reflection" (citation

---

[5] The defendant's neighbor testified that the defendant was agitated, that his eyes were "bugging out," that he might have been intoxicated, and that he had admitted to attempting suicide.  One police officer noted that, when he was arrested, the defendant had been in possession of what the officers suspected was cocaine; there was no evidence that the defendant had cocaine in his system. The responding officers described the defendant as anxious but calm, and disputed that the defendant's eyes had been "widening."  Another witness testified that, although the defendant had been drinking a few hours earlier, he had not appeared drunk at that time.

omitted).  See Commonwealth v. Johnson, 435 Mass. 113, 118-119 (2001).  Such reflection can occur over "days, hours, or even seconds."  Id. at 119.  Here, the jury could have found that the defendant acted with deliberate premeditation when shooting his family in response to them "talking down to him" and in response to his earlier dispute with his wife.  The jury also could have found that the defendant shot the victims from close range in the same room.  From this, they could have concluded that the defendant shot the victims in succession, which was sufficient to establish deliberate premeditation.  See id. (obtaining and repeatedly firing gun at close range was sufficient to establish deliberate premeditation); Andrews, 427 Mass. at 440 (firing multiple shots at unarmed victim at close range was sufficient to establish deliberate premeditation).  There was no need for the jury to know the precise positions of the defendant and the victims in order to establish deliberate premeditation; the defendant's argument to the contrary is without merit.

2.  <u>Whether the defendant's statements prior to his arrest should have been suppressed</u>.  The defendant argues that his statements to police near the scene were inadmissible because the officers failed to advise him of his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436 (1966).  The defendant also contends that his statements to police were involuntary, and

that the judge's decision not to conduct a voir dire on the issue requires a new trial.

a. Whether Miranda warnings were necessary. When reviewing the denial of a motion to suppress, we accept the motion judge's findings of fact absent clear error, but independently review the judge's ultimate findings and conclusions of law. Commonwealth v. Scott, 440 Mass. 642, 646 (2004). If we determine that the statements should have been suppressed, we then must decide whether their introduction at trial was harmless beyond a reasonable doubt. See Commonwealth v. Monroe, 472 Mass. 461, 472-473 (2015).

At the outset, it is necessary to clarify specifically which of his statements the defendant seeks to suppress. The statements the defendant made on the night of the shooting can be divided into three categories: (1) statements to his neighbor prior to the arrival of the police; (2) statements to police (with the assistance of his neighbor and, subsequently, a Spanish-speaking police officer who translated the defendant's statements into English); and (3) statements after the defendant was placed in a police cruiser. The defendant concedes that the first set of statements did not require Miranda warnings because they were not made to law enforcement; the third set of

statements was suppressed.  Thus, the defendant's challenge only extends to the second group of statements.[6]

Miranda warnings are required when "a reasonable person in the defendant's position would have believed he was in custody" (citation omitted).  Commonwealth v. Groome, 435 Mass. 201, 211 (2001).  We consider four factors when determining whether an interrogation was custodial in nature:

> "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."

Id. at 211-212 (Groome factors).  No single factor is dispositive.  See Commonwealth v. Bryant, 390 Mass. 729, 737 (1984).

Custodial interrogations are "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any

---

[6] We note that many of the statements the defendant made to the officers were duplicative of those he made to the neighbor prior to the arrival of the police.  The specific statements that the defendant challenges are those pertaining to his use -- and disposal -- of a gun, and his explanation that he had attempted to shoot himself but had run out of bullets.

significant way."  Commonwealth v. Jung, 420 Mass. 675, 688 (1995), quoting Miranda, 384 U.S. at 444.  Whether an interrogation is custodial "depends on [whether] the objective circumstances of the interrogation" engender unduly "compulsive" pressures.  Commonwealth v. Morse, 427 Mass. 117, 124 (1998), quoting Stansbury v. California, 511 U.S. 318, 323 (1994).

In this case, the motion judge's findings of fact were well grounded in the evidence.  She found that four Lawrence police officers, responding to a radio dispatch alerting them to a man who claimed to have killed someone, located the defendant and his neighbor in a parking lot.  After the neighbor told the officers that the defendant had asked the neighbor to call the police because he had killed someone, one of the officers asked the defendant what had happened, whom he had killed, and where he lived.  The defendant, speaking in Spanish with the neighbor translating, told the officer that he had killed his family and provided an address where he said the shootings had taken place.  In response to further questions, the defendant said that he had shot his family because they would not stop yelling at him, that he had tried to shoot himself but had run out of bullets, and that he had discarded the gun upon leaving the house to go for a walk.

The motion judge found that, throughout this initial exchange, the defendant was seated on a curb with multiple

police officers standing around him.  Although the officers were not sure they believed the defendant, they had noticed a small amount of blood on his clothes and acknowledged that they would not have let him leave had he requested to do so.  The officers did not, however, order the defendant to remain seated or physically restrain him.  Absent any independent corroboration of the defendant's claims, they decided to relocate to the address he provided in order to investigate whether anyone there needed assistance.  At that point, the defendant was frisked, handcuffed, and placed in a police cruiser.  Once the officers entered the apartment and found the victims, they arrested the defendant and, for the first time, advised him of his Miranda rights.

Weighing the Groome factors, we conclude, as did the motion judge, that, on balance, the initial interrogation in the parking lot was not custodial and thus did not require Miranda warnings.  The first three factors all weigh against a determination that the defendant had been subject to a custodial interrogation at that point.  The interrogation was in a public parking lot, not in a police station or other secluded area. There was no evidence that the defendant was "either mentally or physically intimidated."  See Bryant, 390 Mass. at 739.  Rather, the evidence indicated that the defendant was not "restrained" and did not "reasonably perceive[] himself to be restrained,"

thus cutting against a finding that the questioning exemplified the "compulsive aspect of custodial interrogation."  See id. at 739-740, and cases cited.

Regardless of whether the officers would have allowed the defendant to leave, there is no indication that he was considered a suspect during the initial conversation in the parking lot.  Moreover, there is no evidence that the officers ever communicated to the defendant that he was a suspect or that he was not free to leave.  See Morse, 427 Mass. at 123-124 (officer's subjective view that individual being questioned was suspect relevant only to extent that officer communicated this belief to individual).  In addition, there was no evidence that the officers were accusatory or aggressive; upon arriving on the scene and being unsure whether a crime had been committed, they simply asked the questions necessary to assess the situation.

The fourth Groome factor -- whether the defendant was free to leave -- possibly weighs in the defendant's favor.  As the defendant argues, the officers did testify that they would not have let the defendant leave had he tried to do so.  In addition, a person in the defendant's position, i.e., having admitted to killing someone, reasonably might believe that he or she was in custody.  Assuming without deciding, however, that the defendant is correct, this single factor does not transform the interrogation into a custodial inquiry.  See Commonwealth v.

Cawthron, 479 Mass. 612, 624 (2018) (where environment was not coercive and other Groome factors weigh against finding of custody, fact that defendant was not free to leave was insufficient to establish custodial interrogation).

Accordingly, those statements made by the defendant to police prior to being placed in the police cruiser did not require Miranda warnings.

b. Whether the statements were voluntary. The defendant also argues that his statements to the police were involuntary, and that the trial judge's decision not to conduct a voir dire to ascertain whether the statements were voluntary requires a new trial.

Where a question is raised as to the voluntariness of a defendant's statement, a judge must conduct a voir dire hearing on the issue outside the presence of the jury, and must make a determination whether the statement was voluntary before it may be considered by a jury. See Commonwealth v. Harris, 371 Mass. 462, 468-469 (1976). A defendant also may request that the jury be instructed to consider the issue. When such an instruction is given, each juror must assess the voluntariness of a defendant's statements, and should not consider the statement as evidence unless satisfied beyond a reasonable doubt that it was voluntary. See Commonwealth v. Watkins, 425 Mass. 830, 836 (1997). Even where a defendant does not request a voir dire on

the voluntariness of his or her statement, if the evidence presented at trial raises "a substantial claim of involuntariness," a judge's failure "to conduct a voir dire, to make the necessary ruling and to instruct the jury properly . . . on his [or her] own motion constitutes reversible error" (emphasis added).  Harris, supra at 470-471.

After the denial of his motion to suppress, at trial the defendant did not request a voir dire on the voluntariness of his statement.  Thus, we must consider whether the evidence introduced at trial raised a sufficiently "substantial" issue of voluntariness so as to have required the judge to address the issue sua sponte.  We conclude that it did not.

In Harris, the "substantial claim" pertaining to voluntariness was evidence that the defendant "confessed to the police only after having been beaten."  Id. at 472.  Here, there was no evidence of overt coercion.  The defendant argues, however, that there was evidence he had been drinking and might have been intoxicated, that he was agitated while waiting for police, and that he professed suicidal thoughts.  Together, he maintains, this evidence raised a substantial question whether his statements were voluntarily made.

While "intoxication may render a confession involuntary," "mere evidence of drinking alcohol or using drugs" does not trigger a trial judge's obligation to inquire into voluntariness

sua sponte. Commonwealth v. Brady, 380 Mass. 44, 49 (1980). Moreover, suicidal thoughts "do not necessarily negate the voluntariness of a confession." See Commonwealth v. Lopes, 455 Mass. 147, 168 (2009). None of the witnesses testified that the defendant had had difficulty interacting with the witness or answering questions. In addition, witnesses offered competing statements as to the defendant's demeanor.[7] Unlike the clear evidence of overt coercion in Harris, 371 Mass. at 470-472, the inconsistent evidence regarding the defendant's intoxication and agitated demeanor did not amount to a "substantial claim" that his statements were involuntary. The judge thus was not required, absent a request from the defendant, to conduct a voir dire on the issue of voluntariness.

Moreover, the judge instructed the jury that they were not to accept the defendant's statements as evidence unless they were satisfied that the statements had been made voluntarily. The jury were free to weigh the competing evidence and to decide for themselves whether they were satisfied that the defendant's statements were voluntary. We discern no error.

---

[7] The defendant's neighbor testified that the defendant was not calm and acknowledged that he "might have been on something." Another witness, however, testified that the defendant did not seem drunk when he left his sister-in-law's house (approximately one and one-half hours before the shootings), and a police officer testified that the defendant had appeared calm during his interaction with police.

3. _Requested question about juror bias_.  The defendant maintains that the trial judge's denial of his request to pose a question about anti-Hispanic bias during juror empanelment requires a new trial.  "[A]s a practical matter, when a motion that prospective jurors be interrogated as to possible prejudice is presented, we believe the trial judge should grant that motion."  See Commonwealth v. Espinal, 482 Mass. 190, 201 (2019), quoting Commonwealth v. Lumley, 367 Mass. 213, 216 (1975).  Nonetheless, in these circumstances, the judge did not abuse his discretion in declining to do so.

During juror voir dire, the defendant requested that the judge ask each member of the venire whether the juror believed that "Hispanics, from cities such as Lawrence, are more likely to commit crimes of violence than any other ethnicity [or] people."  Stating that he had no evidence that such a bias existed, and concerned that the impact of the question might be to cause ethnic bias, the judge declined to pose the question. The judge did agree, however, to ask jurors whether the fact that the defendant would require an interpreter could affect their ability to remain impartial; he reasoned that this question might "overlap" with the issue of ethnic bias.

We review a trial judge's decisions regarding the scope of jury voir dire for abuse of discretion.  See Commonwealth v. Lopes, 440 Mass. 731, 736 (2004).  Where there is a "substantial

risk of extraneous issues that might influence the jury,"
however, we have said that, upon request, the judge must inquire
into the subject of that bias through individual questioning.
Id. at 736-737.  A substantial risk exists "whenever the victim
and the defendant are of different races or ethnicities, and the
crime charged is murder, rape, or sexual offenses against
children."  Espinal, 482 Mass. at 196.

"A judge need not," however, "probe into every conceivable
bias imagined by counsel," id. at 198, and "is warranted in
relying upon his [or her] final charge to the jury to purge any
bias from the jurors prior to their deliberations," Commonwealth
v. Estremera, 383 Mass. 382, 388 (1981).  "A defendant's 'bare
allegation' that there exists a 'widespread belief' that could
result in bias is not sufficient to cause us to conclude that
the judge abused his [or her] discretion by declining to conduct
voir dire on the issue" (citation omitted).  Espinal, 482 Mass.
at 200.

In the present case, both the defendant and the victims are
Hispanic.  Thus, the case did not present the type of
"substantial risk of extraneous issues" that we held in Espinal
obligates a judge to probe ethnic or racial bias by voir dire as
a matter of law (citation omitted).  See id. at 196.  We discern

no abuse of discretion in the judge's determination not to conduct the requested voir dire in this case.[8]

The defendant points to the fact that multiple jurors were excused based on the judge's questions as proof that the jury pool was tainted with anti-Hispanic bias.  Evidence that one question proved effective in uncovering bias does not by itself demonstrate that a different question would have proved more effective, or that jurors who did not disclose any bias were being untruthful.  See Commonwealth v. Entwistle, 463 Mass. 205, 221 (2012), cert. denied, 568 U.S. 1129 (2013) (where some jurors indicated that they could not be impartial in response to voir dire questions on pretrial publicity, there was no reason to conclude that jurors who stated they could remain impartial were being dishonest).

In sum, there was no abuse of discretion in the judge's decision not to pose to the venire during juror voir dire the requested question on anti-Hispanic bias.

4.  Review under G. L. c. 278, § 33E.  The defendant urges us to order a new trial or to reduce the degree of guilt

---

[8] Indeed, the judge opted to ferret out racial or ethnic bias by asking each potential juror whether the juror could be impartial notwithstanding that the defendant required an interpreter.  See Commonwealth v. Colon, 482 Mass. 162, 181 n.16 (2019) (judge excused juror who, during individual voir dire, stated that defendant's reliance on interpreter would affect juror's ability to remain impartial).

pursuant to our authority under G. L. c. 278, § 33E.  Having reviewed the entire case pursuant to our statutory obligation, we conclude that there is no basis to grant the requested relief.

<u>Judgments affirmed</u>.