## Commonwealth vs. Randy Silva.

Bristol. October 9, 2009. - December 21, 2009.

Present: Marshall, C.J., Spina, Cowin, Botsford, & Gants, JJ.

*Homicide. Practice, Criminal,* Capital case, Grand jury proceedings, Indictment, Voir dire, Empanelment of jury, Opening statement, Argument by prosecutor, Instructions to jury, Assistance of counsel. *Grand Jury. Evidence,* Grand jury proceedings, Relevancy and materiality. *Jury and Jurors. Malice. Self-Defense.*

A Superior Court judge did not err in denying a criminal defendant's motion to dismiss the indictments, in which the defendant alleged misconduct in the Commonwealth's presentation of evidence to the grand jury, where any inaccuracies probably would not have affected the outcome of the grand jury process; where, although the Commonwealth's presentation was sloppy in parts, that sloppiness did not appear to have been designed to secure indictments; and where the presentation otherwise appeared to have been generally fair and balanced. [508-512]

At a murder trial, the judge did not abuse his discretion in declining the defendant's request to ask three sets of questions of prospective jurors individually, where the confidential juror questionnaire covered much of what the defendant sought from the questions he had requested, and where the facts of the case did not require further questions. [512-513]

At a murder trial, the prosecutor's opening remark, describing the killing as cold blooded, although improper, did not create a substantial likelihood of a miscarriage of justice, where the statement was little more than an expression of her theory that the killing was committed with deliberate premeditation [513-514]; further, her summary of a witness's anticipated testimony was fairly based on what she reasonably expected the evidence to demonstrate [514-515].

At a murder trial, no error arose from the prosecutor's use, in closing argument, of enthusiastic rhetoric to describe the defendant's weapon [515], and her reference to the character of several witnesses as less than desirable had factual basis and constituted permissible argument [515]; moreover, there was no basis for the defendant's allegations that the prosecutor twice made points without evidentiary support or unfairly asked the jury to disregard evidence of the victim's drug use [515-516]; finally, the prosecutor reasonably and fairly challenged the defendant's credibility on the issue of drug use [516-517], and her single impermissible comment on the character of the neighborhood did not appear to have swayed the jury [517].

At the trial of indictments alleging murder in the first degree and armed assault with intent to kill, an incidental misstatement in the prosecutor's closing

argument did not create a substantial likelihood of a miscarriage of justice [517-518]; further, there was adequate evidentiary support for the prosecutor's arguments that the assault victim had not wished to provoke a fight [518] and that the defendant knew that the assault victim was unarmed [518]; finally, the defendant's arguments that the prosecutor improperly urged a guilty verdict [518-519] or made prejudicial statements regarding a police training manual [519] lacked merit.

At a murder trial, no prejudice arose from the erroneous admission in evidence of several police training manuals owned by the defendant, where, although the manuals were not relevant to the question of the defendant's competence to handle firearms (as alleged by the Commonwealth), the Commonwealth's failure to focus on the manuals at trial and the prosecutor's failure to mention the manuals in closing argument suggested to the jury that the manuals were not important to the Commonwealth's case; further, any prejudice arising from the incorrect definitions of crimes contained in the manuals was cured by the judge's instructions to the jury, whose questions indicated that they focused on the judge, and not the manuals, as their source for the law. [519-522]

There was no merit to a criminal defendant's argument that, at a murder trial, the judge's instructions to the jury on heat of passion induced by reasonable provocation or sudden combat as factors in mitigation of murder were inconsistent and confusing [522-525]; further, the judge's instructions on self-defense and the use of excessive force in self-defense, although seemingly in conflict, were sufficiently clear and could not have confused the jury [525-526].

A Superior Court judge did not err in denying a criminal defendant's motion for a new trial, brought on the ground that trial counsel provided substandard cross-examination and impeachment of two key Commonwealth witnesses, where counsel's cross-examination of the first witness was effective and thorough, and where counsel's decision not to impeach the second witness with a prior inconsistent statement was a tactical decision that was not manifestly unreasonable. [526-528]

A Superior Court judge hearing a criminal defendant's motion for a new trial, in which the defendant alleged ineffective assistance of trial counsel, did not err in denying the defendant's motion to strike the trial counsel's affidavit, which disclosed no more than was necessary to address the claims of ineffective preparation of the defendant for testimony. [528-529]

This court declined to exercise its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or to order a new trial, where, although there were numerous errors at trial, in the aggregate, they did not create a substantial likelihood of a miscarriage of justice. [529]

INDICTMENTS found and returned in the Superior Court Department on April 27, 2001.

A motion to dismiss was heard by *John A. Tierney*, J.; the cases were tried before him, and a motion for a new trial, filed on September 8, 2006, was heard by *Richard T. Moses*, J.

*Alan Jay Black* for the defendant.

*Steven E. Gagne*, Assistant District Attorney (*Garrett R. Fregault*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant was convicted of the deliberately premeditated murder of James Schiano, armed assault with intent to kill David DeAndrade, and assault and battery of DeAndrade by means of a dangerous weapon. The defendant filed a motion for a new trial, which was denied. The appeal from the denial of that motion was consolidated with his direct appeal. On appeal the defendant asserts error in (1) the denial of his motion to dismiss the indictments, which alleged misconduct in the presentation of evidence to the grand jury; (2) the failure of the judge to ask certain questions of prospective jurors; (3) the prosecutor's misstatement of the evidence and use of inflammatory rhetoric in her opening statement and closing argument; (4) the admission in evidence of several police manuals that contained prejudicial material and incorrect definitions of crimes; (5) the failure of the judge to instruct the jury properly on reasonable provocation; and (6) the denial of his motion for a new trial, which alleged ineffective assistance of trial counsel. The defendant also asks us to exercise our powers under G. L. c. 278, § 33E, and reduce the degree of guilt or order a new trial. We affirm the convictions and the denial of the motion for a new trial. We decline to exercise our authority under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. Recitation of other facts is reserved for discussion of the issues raised on appeal.

In March, 2001, Jeffrey Padon and his girl friend, Julie Soloway, lived in Taunton with Soloway's coworker, Shrayna Ambers, and Ambers's young child. Padon and Soloway had purchased some cocaine from David DeAndrade, for which they owed him fifteen dollars. DeAndrade telephoned them several times demanding his money.

On the afternoon of April 7, 2001, DeAndrade went to their apartment to demand payment. He left a message with Ambers, telling her that if he did not get his money, "something's going to happen." Ambers conveyed the message to Padon and Soloway when they returned. Padon telephoned DeAndrade and told him he had the money, but DeAndrade instead wanted a fight and said he would stop by "with my boys."

Concerned that he would be outnumbered, Padon telephoned the defendant and asked for his help in the event of trouble.[1] A short while later the defendant appeared at Padon's apartment with two other men. After Padon told him what DeAndrade said, the defendant assured him nothing would happen. The defendant said he would return. He and his companions left. The defendant alone returned to Padon's apartment about two or three hours later. DeAndrade arrived about ten minutes later, shortly before 8 P.M. He had met James Schiano and three women, and was driving them to a party. He stopped at Padon's apartment on the way.

Padon, Soloway, Ambers, and the defendant went outside to meet DeAndrade in the driveway. Soloway offered DeAndrade the fifteen dollars she and Padon owed him, but he refused and pushed her away. He repeatedly lifted his shirt and challenged Padon to fight. The defendant approached DeAndrade and said, "Don't do it, partner. It's not worth it." They shouted at each other.[2] Soloway told them to get away from her house. The defendant said, "Oh, tough guy, huh? I got something for you," and started walking away. DeAndrade followed, fearing the defendant might have stashed a gun nearby. The defendant started running and DeAndrade kept pace. As they passed DeAndrade's car, Schiano and one of the women got out of the car and followed them.

Just before DeAndrade caught up to him, the defendant turned and pointed a gun at DeAndrade. A voice shouted, "I'll show you," and the defendant shot DeAndrade twice in the hip, once in the hand, once in the left bicep, and once in the right shoulder. DeAndrade fell to the ground.[3]

Schiano attended to DeAndrade, and asked the defendant why he shot him. As Schiano stood up, the defendant ran toward him and shot him six times. One of the shots penetrated Schiano's heart and both lungs, killing him.

---

[1] At the time, DeAndrade was five feet, seven inches tall and weighed 155 pounds. Padon was about six feet tall and weighed about 200 pounds. The defendant was five feet, eight inches tall and weighed about 171 pounds.

[2] DeAndrade alone testified to a somewhat different version, which the prosecutor relied on in her closing argument. DeAndrade did not testify that he refused the money Soloway offered, or that he insisted on fighting Padon. He said he had no recollection of any verbal altercation.

[3] DeAndrade eventually recovered from his wounds.

On hearing the gunshots, Padon, Soloway, and Ambers ran back to their apartment. The defendant arrived within minutes. He had a gun with a red light on it, similar to a laser. The defendant and Padon spoke over the telephone three times later that night. The defendant expressed concern that the shell casings at the scene could be traced to his gun, and he asked Padon to gather them. He told Padon that they all had to come up with the same story to cover up what happened. He first suggested that they say DeAndrade never appeared. He later said he wanted Padon and the others to say that DeAndrade had been "beating on him," and that he shot DeAndrade in self-defense.

The defendant was arrested the next morning. He told police that he did not mean to shoot anybody, but that the victims had knives. Neither DeAndrade nor Schiano had any weapon. Police executed a search warrant at the defendant's residence and found a black Glock .40 caliber semiautomatic pistol equipped with an "aftermarket laser sighting device" for nighttime shooting (activated by a button on the side of the pistol), a fifteen-round magazine for the pistol, ammunition, the defendant's licenses to carry firearms, several police officer examination manuals, a certificate of completion from the student trooper program run by the State police, and a certificate of completion from a corrections program, as well as other items.

A State trooper assigned to the firearms identification section of the State police crime laboratory opined that fourteen shell casings recovered from the scene were fired from the defendant's Glock pistol. He testified that the pistol originally was equipped with a recoil spring that was removed to allow installation of the laser sighting device inside the pistol. In his opinion the pistol was a large-caliber weapon with significant recoil that would cause the pistol to rise up about eighteen inches after firing, and it would have to be aimed again before another round could be discharged with accuracy.

The defendant testified at the trial. He said that DeAndrade was out of control and repeatedly challenged Padon to a fight. DeAndrade told the defendant to mind his own business, and started moving toward him. The defendant heard a car door open, and he saw two figures moving toward him. He became concerned for his own safety, having previously been stabbed in 1998, after which he began carrying a loaded gun. He tried to flee the scene,

but someone chased him. As footsteps closed in on him, he found himself against a fence near the end of the street. Thoughts of being trapped and imminent death ran through his mind. He turned and saw DeAndrade and Schiano bearing down on him. DeAndrade raised his hand as if to grab him. The defendant shot him. He then shot Schiano, who was "right on top" of him. The defendant said he had been so frightened that they had weapons and knives that he fired the pistol rapidly. He could not recall whether he activated the laser sighting device.

The defendant acknowledged that he never saw either man with a weapon, although he thought DeAndrade might have had one based on the way he was lifting his shirt while trying to provoke a fight with Padon. He also acknowledged knowing at the time that the shooting occurred at a "T-bone intersection" of two streets, that is, that he had not run to the end of a dead-end street. He admitted he fired no warning shots, but claimed he was not aiming the gun when he shot DeAndrade and Schiano. The defendant said he routinely carried his pistol with him, fully loaded, with one round in the chamber ready to fire.

The defendant had been employed as a correction officer at the Plymouth County sheriff's department for about eight months in 1993, where he had received firearms training. He had been employed part time as a security guard and a construction worker up to the time of the shootings. He had held a license to carry firearms for twelve years. The defendant considered himself "a pretty good shot," having scored ninety-eight per cent on target shooting during his training. He went target shooting two to three times per year, and most recently three to five days before the shootings. He had studied to become a police officer, had taken several civil service examinations, and was "on the list" for the State police.

2. *Motion to dismiss.* The defendant filed a pretrial motion to dismiss the indictments on grounds that the integrity of the grand jury proceedings was impaired by the Commonwealth's presentation of inaccurate testimony and by its failure to present exculpatory evidence that was material and would have affected the decision to indict. The trial judge denied the motion to dismiss, reasoning that although the officer may have testified inaccurately, the defendant failed to show that the officer's testimony was not given in good faith. The defendant cites several instances where

he asserts the grand jury were presented false testimony or were not fairly informed, and he asserts error in the denial of his motion to dismiss.

Dismissal of an indictment based on impairment of the grand jury proceedings requires proof of three elements: (1) the Commonwealth knowingly or recklessly presented false or deceptive evidence to the grand jury; (2) the evidence was presented for the purpose of obtaining an indictment; and (3) the evidence probably influenced the grand jury's decision to indict. *Commonwealth* v. *Mayfield*, 398 Mass. 615, 620-622 (1986). Inaccurate testimony made in good faith does not require dismissal of an indictment. *Id.* at 620, citing *Commonwealth* v. *Reddington*, 395 Mass. 315, 320 (1985). Failure to present known information also may impair grand jury proceedings in circumstances that warrant dismissal. See *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984) (failure to disclose known information that would greatly undermine credibility of important witness); *Commonwealth* v. *O'Dell*, 392 Mass. 445, 446-447 (1984) (unfair and misleading to withhold exculpatory portion of defendant's statement).

The sole witness before the grand jury was a Taunton police detective. The defendant contends that the officer falsely testified that Soloway, Padon, and Ambers saw the defendant shoot Schiano and that Padon and Soloway told the same story to police. He further contends that none of them saw the Schiano shooting. Although the detective's testimony was not entirely accurate, it would not have affected the decision to indict. Padon and Soloway told police they saw the defendant shoot someone, and there was never a question that the defendant shot both men with his own pistol.

The detective testified that no weapons were found at the scene. Later he was asked if any weapons were found in DeAndrade's car. He answered, "No." The defendant says that this testimony was false because a razor knife was found in DeAndrade's car in the course of a motor vehicle inventory search. Although the detective's testimony was not accurate, an accurate account probably would not have affected the decision to indict because there was no evidence the item had been brandished, used, or even displayed by anyone during the incident.

The defendant has identified two matters involving exculpatory evidence that were not presented to the grand jury. First,

Soloway had told police that DeAndrade appeared to be "high and acting like he wanted to fight," and blood tests performed on DeAndrade at a hospital indicated the presence of marijuana, cocaine, heroin, and Valium. It is unclear whether these tests were available at the time of the officer's grand jury testimony, April 26, 2001. The report indicates it was printed on May 22, 2001, after the defendant was indicted. Second, when DeAndrade first went by Padon's apartment on April 7, 2001, he told Ambers he would "come over with his boys" to beat up her roommate. He asserts this is based on Ambers's trial testimony. However, her trial testimony was not as the defendant states. Nevertheless, Padon testified at trial that DeAndrade said these words to him, and Soloway's statement corroborates this.

"A prosecutor is not required to present all possibly exculpatory evidence to a grand jury." *Commonwealth* v. *Connor, supra.* See *Commonwealth* v. *O'Dell, supra.* The failure to present the evidence cited by the defendant does not require dismissal of the indictments because it was not exculpatory evidence that would have affected the credibility of an important witness, see *Commonwealth* v. *Connor, supra,* and there is no indication that it was withheld for the purpose of securing an indictment. *Commonwealth* v. *Mayfield, supra* at 621.

Moreover, the grand jury heard testimony of DeAndrade's "threatening remarks" to Ambers to "tell [Padon] I'm coming for my fifteen dollars and if I don't get my fifteen dollars . . . there's going to be problems, and you have a little baby there and maybe you shouldn't be there when we come back." These statements were the equivalent of what the defendant says had not been presented. The grand jury also heard testimony that when DeAndrade arrived, Soloway offered him fifteen dollars, but "DeAndrade appeared very agitated and . . . didn't want to take the money." They were told that the defendant went up the street and DeAndrade followed him. As they walked past a car, Schiano got out of the car and walked toward the defendant. "It looked like there was going to be a fight," and Schiano got out to help DeAndrade. The grand jury heard that the defendant told Padon, Soloway, and Ambers that he acted in self-defense, and that he told police that he did not mean to shoot anyone but had acted in self-defense. He also told police that he was scared, and that the two men had knives. This was a fair presentation of the evidence,

and it does not appear that any omission was calculated to secure an indictment.

The defendant next contends that in response to a question from a grand juror whether any of the women passengers in De-Andrade's car had described DeAndrade's behavior before they arrived at Padon's apartment, the officer falsely answered in the negative. One of the passengers had reported to a different detective that Schiano and DeAndrade had smoked a marijuana cigar shortly before the shooting, and she reported that DeAndrade was "wicked hyper," and this was not presented to the grand jury. The fact that DeAndrade may have been "high" and appeared "wicked hyper" adds little, if anything, to the evidence of his hostile behavior that was presented to the grand jury. It likely would have had no effect on the outcome of the grand jury process.

Finally, the defendant complains that the prosecutor presenting the case to the grand jury asked the detective whether there was anything that would justify the defendant's shooting of the two men. The officer answered in the negative. Although this testimony amounted to a legal opinion that would not have been admissible at trial, it does not appear to have been designed to obtain indictments. To obtain an indictment the Commonwealth need only present sufficient evidence to establish the identity of the accused, and probable cause to arrest him for the crimes charged. See *Commonwealth* v. *Levesque,* 436 Mass. 443, 447 (2002), quoting *Commonwealth* v. *McCarthy,* 385 Mass. 160, 163 (1982). The Commonwealth is not required to present evidence of so-called defenses or otherwise disprove such matters before the grand jury. Evidence that the defendant fired in self-defense need not preclude an indictment charging murder. See, e.g., *Commonwealth* v. *McGahee,* 393 Mass. 743, 746-747 (1985); *Commonwealth* v. *McJunkin,* 11 Mass. App. Ct. 609, 613 (1981). The detective's statement was not the type of statement that impairs the integrity of the grand jury process. See *Commonwealth* v. *Mayfield, supra*; *Commonwealth* v. *Connor, supra*. In any event, the Commonwealth did not withhold evidence of the defendant's version of the incident. The grand jury heard evidence that the defendant believed he had acted in self-defense, and his statement that he was afraid, that the two men had pursued him, and that they had knives. The Commonwealth's presentation

was sloppy in parts, but that sloppiness does not appear to have been designed to secure indictments, and the presentation to the grand jury appears to have been generally fair and balanced. In addition, the subjects of the defendant's claim of impairment probably had no impact, or would have had no impact, on the decision to indict. There was no error in the denial of the motion to dismiss.

3. *Jury voir dire.* The defendant argues that the judge erred by refusing to ask three sets of questions of prospective jurors individually. Those questions were (1) whether the prospective juror or any member of the prospective juror's family, or a close acquaintance, had ever been the victim of a crime and, if so, what crime, and whether that experience would affect the prospective juror's ability to render a fair and impartial verdict; (2) whether the prospective juror or any member of the juror's family, or a close acquaintance, ever worked for a law enforcement agency and, if so, the details of such employment; and (3) whether the prospective juror would find the testimony of a police officer more credible than that of a civilian witness simply because of his or her position as a police officer.

Beyond the questions mandated by G. L. c. 234, § 28, and the confidential juror questionnaire of each member of the venire required by G. L. c. 234A, § 22, the scope of jury voir dire rests in the sound discretion of the trial judge, and a judge's determination that the jury stand impartial will not be disturbed on appeal absent a showing that the judge abused his discretion or that the judge's determination was clearly erroneous. *Commonwealth* v. *Lopes,* 440 Mass. 731, 736 (2004). The defendant concedes that, other than the circumstance of interracial murder, which was the subject of a mandatory individual voir dire, see *Commonwealth* v. *Young,* 401 Mass. 390, 398 (1987), overruled in part on another ground by *Commonwealth* v. *Ramirez,* 407 Mass. 553, 555 (1990), this case presents none of the situations that requires any particular inquiry beyond those mandated by statute. See *Commonwealth* v. *Lopes, supra* at 737. Instead, he contends that our expressed preference that judges ask precisely the questions that the judge declined to ask here requires a reversal and a new trial. See *Commonwealth* v. *Lopes, supra* at 735-737 (questions regarding experience as victim); *Commonwealth* v. *Sheline,* 391 Mass. 279, 289-291 (1984) (questions regarding

jurors' inclination to give greater credence to testimony of police officer).

Although we have said that ordinarily we expect trial judges to ask questions such as those requested here, we have never said that the refusal to do so, standing alone, constitutes reversible error. *Commonwealth* v. *Lopes, supra* at 737-738; *Commonwealth* v. *Sheline, supra* at 291. Our "prefer[ence]," as the defendant refers to it, is that justice not be constricted by an obeisance to efficiency. See *Commonwealth* v. *Lopes, supra* at 737. There is no indication that this judge was impatient, and we perceive no abuse of discretion in the conduct of this jury voir dire.

The confidential juror questionnaire asked each member of the venire his or her present or past involvement as a party to civil or criminal litigation, and his or her relationship to a police or law enforcement officer. See G. L. c. 234A, § 22. The judge asked the venire whether "the nature and seriousness of these charges make it difficult for you to render a fair and impartial verdict?" He also asked if there was "any reason at all why you would not be completely impartial in this case and be able to render a true and just verdict based solely on the evidence and the law that I'll instruct you on at the end of the trial? Any reason at all why you couldn't be completely fair and impartial in this case to both sides?" See G. L. c. 234, § 28. These questions covered much of what the defendant had sought from the three questions he had requested, and nothing further was required by this case.

To the extent the questions put to the venire did not specifically address police officer credibility, this case did not turn on police officer credibility. None of the law enforcement witnesses was a percipient witness to the shooting, and the defendant did not materially dispute the testimony of any police officer at trial. "A trial judge, who is aware of the facts of a particular case and can observe firsthand the demeanor of each prospective juror, is in the best position to determine what questions are necessary reasonably to ensure that a particular jury can weigh and view the evidence impartially." *Commonwealth* v. *Lopes, supra* at 736. The judge did not abuse his discretion in refusing to ask the questions requested by the defendant.

4. *Prosecutor's opening and closing.* The defendant alleges

that the prosecutor prejudicially and improperly attacked him in her opening statement and closing argument. There was no objection to the opening statement; there were some objections to the closing argument, which we address by category.

(a) *Opening statement.* The prosecutor began her opening by saying the evidence would show that the defendant shot both victims "in cold blood" and left one of them to die, all over a fifteen-dollar drug debt. She continued on for thirteen pages laying out in great detail what she expected the evidence would be. She ended her opening by stating that she expected the evidence to prove that the defendant "gunned down two unarmed men without provocation, without justification, without excuse."

Because there was no objection, we review to determine if any misconduct created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992). The prosecutor's opening remark, describing the killing as cold blooded, was improper argument for an opening. See *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978), quoting *Posell* v. *Herscovitz*, 237 Mass. 513, 514 (1921) ("The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by the evidence"). However, it was little more than an expression of her theory that the killing was committed with deliberately premeditated malice aforethought, and was not, as she stated in her opening, one of provocation, justification, or excuse. The statement was otherwise firmly and fairly grounded on what she reasonably expected to prove, see *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999), and did not create a substantial likelihood of a miscarriage of justice. Cf. *Commonwealth* v. *Murphy*, 442 Mass. 485, 496 (2004) (statement in *closing argument* that victims were murdered "in cold blood" not improper where evidence permitted inference that murders were unprovoked, senseless, and brutal).

The second aspect of the opening statement with which the defendant takes issue is the assertion that one witness had a "bird's eye view of the slaughter of Jimmy Schiano." The witness testified that she heard shots and looked out her window. She saw two men about two feet apart. One was moving toward the man with the gun, waving his hands as if to say stop. He had nothing in his hands, and he appeared very anxious. The man

with the gun kept stepping backward as he fired several shots into the other man. As the last two shots were fired, the victim became very disoriented and just fell backward. The shooter moved closer and examined the body, then fled. The prosecutor's summary of the witness's anticipated testimony was fairly based on what she reasonably could expect the evidence would be. Her description of this shooting of an unarmed man as a "slaughter" was improper argument for an opening statement, but by itself it did not create a substantial likelihood of a miscarriage of justice.

(b) *Closing argument (preserved claims)*. The defendant objected to the prosecutor's description of the defendant's gun as a "cannon." This falls into the category of "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," and is not grounds for reversal. *Commonwealth* v. *Wilson*, 427 Mass. 336, 350 (1998), quoting *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997). The jury are assumed to possess sufficient sophistication in sorting out excessive claims. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). See *Commonwealth* v. *Degro*, 432 Mass. 319, 327-328 (2000) (prosecutor's description of murder weapon as "butcher knife" was "enthusiastic rhetoric" and not improper). The jury could infer that the defendant's pistol was powerful based on evidence that it was a large-caliber weapon with significant recoil of approximately eighteen inches after each firing.

The prosecutor's statement that "[w]hen you prosecute a case in hell, you don't have angels for witnesses" was in response to defense counsel's aggressive attacks on the credibility of Commonwealth witnesses. This statement was a variation of an age-old expression used by prosecutors to acknowledge the credentials of certain witnesses as less than desirable. Far from constituting impassioned rhetoric designed to inflame the emotions of the jury, see *Commonwealth* v. *Kozec*, *supra* at 517, the comment appears to refer to the character of several witnesses, and in this respect it had factual basis and constituted permissible argument. See *Commonwealth* v. *Dixon*, 425 Mass. 223, 230-231 (1997) (argument that "these people [come from] a whole different planet [with] a whole different moral code" had factual basis and was not impermissible).

The defendant cites two instances where he claims the prosecutor made points without evidentiary support. We disagree. The

prosecutor's description of the defendant as a "good backup security officer" was based on evidence that the defendant was employed as a security officer and on Padon's testimony that he called the defendant and asked him to come by to "watch my back." There also was evidence that Schiano had been shot in the back of the head, providing a basis for the prosecutor to argue that the defendant shot him when he was posing no threat. In each instance the prosecutor properly was "marshal[ing] the evidence and suggest[ing] inferences that the jury may draw from it." *Commonwealth* v. *Drayton*, 386 Mass. 39, 52 (1982).

The defendant asserts that the prosecutor overstepped her bounds when she argued that while "Schiano had the audacity to smoke some dope, and drink some beer . . . the penalty in Massachusetts for that is not the death penalty." The comment was made in response to defense counsel's repeated references to the drugs Schiano and DeAndrade had consumed, and his repeated description of DeAndrade's car as a "pharmacy . . . of illegal narcotics." Defense counsel had not argued that the drugs affected credibility, but instead implied that Schiano was in a stupor and was partly to blame for his own death. The prosecutor's argument suggested that the jury focus on the actions of Schiano as they related to the defendant, not on the fact that he may have consumed illegal drugs. She later recalled the testimony of the witness with the "bird's-eye view," who said she saw one man shoot an unarmed man who was gesturing with his hands as a plea to the shooter to stop. We conclude that the argument was grounded in the evidence and fairly asked the jury to disregard defense counsel's reference, as argued, to drugs.

The defendant takes issue with that portion of the prosecutor's closing argument that characterized as unbelievable the defendant's testimony that he was unaware of Padon's and Soloway's drug use. She was not arguing, as the defendant contends, that he, the defendant, was a drug user. She was challenging his credibility as a witness by suggesting his testimony on the issue of their drug use was implausible because Padon and Soloway used drugs regularly, the defendant was a frequent visitor to their apartment, and therefore he must have known they used drugs. The inference she was asking the jury to draw was based on the evidence. It was reasonable and fair. See *Commonwealth* v. *Kozec*,

399 Mass. 514, 516 (1987), citing *Commonwealth* v. *Earltop*, 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring).

Finally, the defendant faults the prosecutor for her reference to the congested, residential nature of the neighborhood in which the defendant repeatedly discharged his firearm. He argues that the prosecutor impermissibly asked the jury to consider this as evidence of his indifference to the victim's suffering, a factor that may be considered when deciding if murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). The Commonwealth contends that this was fair argument because the point the prosecutor was making was that the defendant's indifference to the disruption of the tranquility of the neighborhood that this shooting would cause was probative of his indifference to Schiano's suffering. The nexus the Commonwealth urges is not reasonable. The Commonwealth may not support a conviction of murder with extreme atrocity or cruelty with evidence of indifference to neighborhood tranquility, and it was wrong to ask the jury to do so. We think there was no prejudice because the argument was rather weak, but more importantly, the jury appear not to have been swayed because they did not convict the defendant under that theory.

(c) *Closing argument (unpreserved claims)*. The defendant's assertion of misconduct in the prosecutor's description of the killing as "cold blooded" is less availing with respect to her closing argument than it was in connection with her opening statement. Similar reasoning applies, except that while it should not have been made as argument in the opening, it was entirely proper argument in the closing. See *Commonwealth* v. *Murphy*, 442 Mass. 485, 496 (2004) (statement in closing argument that victims were murdered "in cold blood" not improper where evidence permitted inference that murders were unprovoked, senseless, and brutal).

The defendant correctly points out that there was no evidentiary support for the prosecutor's reference to a plot "to get DeAndrade over to the house" once the defendant arrived. The prosecutor based her argument on a telephone call she said was made by Padon to DeAndrade after the defendant returned. There was no evidence of such a telephone call. The telephone call in question was placed by DeAndrade after the defendant first arrived and left, but before he returned to the apartment. The

prosecutor was plainly confused by Padon's testimony. We do not think this argument created a substantial likelihood of a miscarriage of justice because it was an incidental aspect of her argument as a whole, and the prosecutor quickly turned to what occurred between DeAndrade and the defendant. It did not likely affect the outcome of the case. The judge's instruction that opening statements and closing arguments were not evidence, and that the jury's recollection of the evidence was controlling, cured any possible prejudice. See *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990).

Contrary to the defendant's assertions, the prosecutor could permissibly argue that DeAndrade arrived for the purpose of getting his money with no expectation of fighting anyone, based on DeAndrade's testimony and evidence that he was unarmed, got out of his car alone, and had four passengers whom he was driving to a party (three of whom were females, not "his boys"). It may not have been a prudent argument in light of overwhelming testimony that DeAndrade was trying to provoke a fight with Padon, but prudence is not the test. Argument need only be based in evidence, which it was. See *Commonwealth* v. *Kozec, supra.*

The defendant contends that there was no evidentiary support for the prosecutor's argument that the defendant knew DeAndrade was unarmed. We disagree. Notwithstanding the defendant's testimony that he did not know whether DeAndrade was armed, there was evidence that DeAndrade repeatedly lifted his shirt to reveal he was unarmed, and the defendant testified he never saw a weapon on DeAndrade. This provided adequate basis for the prosecutor to argue as she did.

The defendant contends that the prosecutor unfairly told the jury that they would have the opportunity to pull the trigger of the pistol, and "[h]opefully, you'll have better luck with it than I do. Excuse me." The defendant does not develop the point in his brief. We do not think the prosecutor was metaphorically urging a guilty verdict, but instead was speaking literally. There had been testimony that the trigger of the pistol requires four and one-half to five pounds of pressure to fire the pistol. We discern the prosecutor's comment to mean that she was handling the gun during this portion of her closing argument, that she was suggesting to the jury that they could pull the trigger as she was about to do but failed, and that she offered a sheepish apology for her

inability to pull the trigger. There was nothing prejudicial in the comment.

The defendant also contends that a reference to a reading comprehension test question in one of the police manuals that states, "Once a criminal, always a criminal," when read in conjunction with that portion of the prosecutor's argument where she said, "What type of people do you think are going to be involved in this type of an incident? And ask yourselves 'Who is the defendant friendly with?' He's friendly with Jeff Padon and Julie Soloway, and he's friendly with George Short," was unfairly prejudicial. There was no objection. The defendant raised this point in the context of the police examination manuals. We perceive no harm because the prosecutor never mentioned the police examination manuals in her closing argument. With respect to the quoted portion of the closing argument, it was not improper by itself. The prosecutor was merely explaining that the defendant chose the Commonwealth witnesses who observed what happened. It did not create a substantial likelihood of a miscarriage of justice.

There was nothing in the prosecutor's argument that requires a new trial.

5. *Police manuals.* Three police manuals seized in a search of the defendant's residence were admitted in evidence, over objection and without limitation. They consist of over 850 pages of materials to assist someone preparing for a police officer examination. The defendant argues that these manuals are replete with material unrelated to the case, that they contain material "written by police [and] for police [and] their entire tone was designed to be pro-law enforcement," and that they contain definitions of crimes, including murder and manslaughter, that do not mirror the Model Jury Instructions on Homicide (1999), particularly the absence of a requirement that the Commonwealth disprove beyond a reasonable doubt such matters as self-defense, sudden combat, and heat of passion.

The Commonwealth contends that the manuals were relevant to show the defendant's familiarity with, and knowledge of, firearms. The Commonwealth further contends that these manuals were merely cumulative of other evidence of the defendant's familiarity with, and knowledge of, firearms, particularly the defendant's certificate of participation in the training program

conducted at the State police academy, his certificate of completion of the training program conducted by the house of correction where he had been employed, his gun cleaning kit, and especially the defendant's own testimony on the subject. The Commonwealth argues that any possible misuse of these manuals was averted by the judge's instructions.

These manuals should not have been admitted in evidence. The Commonwealth has not pointed to one page from which the jury could have found that the defendant was familiar with, or had knowledge of, firearms, and we have found none. One of the manuals contains a single paragraph with a passing reference to the firearms and revolver qualification course at the police academy and the minimum required score to pass the various tests. The paragraph includes the following tip: "Almost anyone can learn to fire a gun with precision, but it does take lots of practice." A second manual contains less than a one-page description of what to expect in the weapons training course at a police academy. This is not relevant to the question of the defendant's competence to handle firearms.

At trial the prosecutor did not identify one place in these voluminous materials where the jury could turn to find evidence of the defendant's competence to handle firearms. At trial the prosecutor also made no attempt to alert the judge to any potentially prejudicial material in the manuals that might need to be redacted or made the subject of a limiting instruction. She improperly thrust over 850 pages of material before the judge, and he, in turn, neglected to press the prosecutor about hundreds of pages that could not possibly have been relevant. Where the manuals erroneously were admitted over objection, we review the issue under the prejudicial error standard. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) (court must be able to say with fair assurance that error did not influence jury, or had but very slight effect).

The manuals were not written for police officers, as the defendant argues, but for persons interested in taking a written examination to become police officers.[4] They are not field manuals for

---

[4]The three manuals are the Commonwealth of Massachusetts Human Resources Division Entry Level Police Officer Examination Orientation and Preparation Guide (2001), the Cliffs Police Officer Examination Preparation

police officers. The ARCO manual contains mostly written examinations that had been used in New York City. The Cliffs manual contains written examinations for three fictitious cities. The examinations purport to test a range of skills, including judgment, reasoning ability, reading comprehension, observation and memory, and writing skills and vocabulary.

The introductory pages of the ARCO and Cliffs manuals contain motivational material that the defendant contends is prejudicial, such as references to police officers being "true knights" and "warrior[s]," and comparisons of police officers to martial artists who fight dragons and win battles, and to "Robin Hood." We view this in much the same way we view enthusiastic rhetoric in a prosecutor's closing — the jury are assumed to have sufficient sophistication to disregard these references or place them in proper perspective. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987). The author of the Cliffs manual realized as much when he wrote: "[W]e just don't say it out loud because in today's society it sounds a little corny."

The defendant cites hypothetical scenarios in the manuals that have some similarities to the defendant's case. These hypothetical cases were merely background materials for multiple choice questions in sample reading comprehension tests. They did not suggest what the verdict should be in the defendant's case.

The defendant cites a statement in one manual attributed to an attendee at a police academy class implying that warring drug dealers should be allowed to kill one another. The statement drew laughter among the members of the class, but the instructor quickly interjected his views by explaining why that response was inappropriate. The defendant does not explain how this brief passage prejudiced him, and we fail to see any prejudice. The defendant's case did not involve a war between drug dealers.

The defendant also contends that in the same conversation at the police academy, the instructor had been explaining that the standard weapon issued by many police departments is the Glock nine millimeter pistol, a weapon similar to that used by the defendant, because they hold eighteen to twenty rounds of

Guide (1st ed. 1994), and the ARCO Police Officer — Written Tests — Physical Exams — Everything You Need to Get Top Test Scores and Launch Your Police Career (15th ed. 2000).

ammunition in the magazine and thus enable officers to better respond to situations with multiple suspects. The defendant does not explain how he was prejudiced by this information, and we perceive no prejudice.

The ARCO manual contains definitions of self-defense and manslaughter that do not mirror the Model Jury Instructions on Homicide, *supra*, and do not express the proper burden of proof. There are also definitions of probable cause to arrest, serious physical injury, vehicular homicide, and other concepts having little or nothing to do with this case. Any prejudice from the material was cured by the judge, who told the jury several times during the trial that he was the sole source of the law, and that they must apply the law as he instructed, even if they did not agree with it. See *Commonwealth* v. *Stone*, 366 Mass. 506, 513 (1974). This instruction was given at the beginning of the jury selection process, in the judge's preliminary instructions immediately after the jury were sworn, and in the final instructions. The jury are presumed to have followed the instruction. *Commonwealth* v. *Silanskas*, 433 Mass. 678, 702 (2001).

We note that on three separate occasions the jury asked to be instructed on specific aspects of the crimes charged. The third set of questions sought reinstruction on self-defense and mitigating circumstances as they relate to assault and battery by means of a dangerous weapon and armed assault with intent to murder. These questions, asked over two days of deliberations, are some indication that the jury were focused on the judge as the source for the law, and not on some extraneous source. See, e.g., *Commonwealth* v. *Morales*, 70 Mass. App. Ct. 526, 534 (2007). Moreover, where the jury acquitted the defendant of murder in the first degree under the theory of extreme atrocity or cruelty, we doubt that the manuals had any impact on their ability to take the law solely from the judge.

Finally, it bears noting that the prosecutor never mentioned the police examination manuals in her closing argument. This, combined with the absence of any focus on the manuals at trial, probably suggested to the jury that the manuals were not important to the Commonwealth's case. We conclude that the defendant was not prejudiced by the three police manuals that were erroneously admitted in evidence.

6. *Jury instructions.* (a) *Mitigation of malice.* The defendant

argues that the judge's instructions on heat of passion induced by reasonable provocation or sudden combat as factors in mitigation of murder were inconsistent and confusing, and require that he be granted a new trial.

The judge instructed the jury on deliberately premeditated murder, murder in the second degree, and self-defense conformably with the Model Jury Instructions on Homicide, *supra* at 6-10, 20-22, 55-58, 61. He then turned to voluntary manslaughter and excessive force in self-defense, which we will address later. The judge failed to address other factors that may serve to mitigate malice, and hence murder, to manslaughter. These include heat of passion induced by reasonable provocation or sudden combat, both of which were warranted by the evidence.

The judge then instructed the jury on the elements of armed assault with intent to murder. In doing so, he failed to instruct on self-defense, but he did instruct that the Commonwealth had the burden to prove beyond a reasonable doubt the absence of mitigation, namely, heat of passion induced by reasonable provocation or sudden combat, or excessive force in self-defense, without any explanation of those terms. He continued with instructions on the lesser included offense of armed assault with intent to kill, followed by instructions on the charge of assault and battery by means of a dangerous weapon. He made no reference to the applicability of self-defense to either.

During the ensuing side bar conference defense counsel pointed out that the judge omitted any reference to mitigation (heat of passion induced by reasonable provocation or sudden combat) as it relates to murder. We take this to be an objection. The prosecutor noted the judge's failure to instruct as to the applicability of self-defense to the nonhomicidal charges. The judge then instructed the jury that, with respect to murder, the Commonwealth must prove beyond a reasonable doubt the absence of mitigating circumstances, namely, heat of passion induced by reasonable provocation and sudden combat, and excessive use of force in self-defense, with no explanation of these terms. The judge also instructed that self-defense was "available" on all the charges, not just murder. The defendant did not object to this instruction.

During the first day of deliberations the jury returned twice with questions. The first involved a request for reinstruction on

the charge of assault and battery by means of a dangerous weapon. The judge reinstructed the jury, and there was no objection. They returned a second time at the end of the day, requesting to be reinstructed on murder and manslaughter. Because of the late hour, they were sent home.

The next day the judge instructed the jury on deliberately premeditated murder, murder in the second degree, self-defense, and voluntary manslaughter (premised on the Commonwealth's failure to prove the absence of heat of passion induced by reasonable provocation and sudden combat, and proof of excessive use of force in self-defense), all conformably with the Model Jury Instructions on Homicide, *supra*, except for a matter involving excessive force in self-defense that, as we previously have indicated, will be discussed later. There was no objection.

The jury returned a third time. They asked to be instructed how self-defense and mitigating circumstances apply to the crimes of armed assault with intent to murder, and assault and battery by means of dangerous weapon. The judge reinstructed on self-defense, and he told the jury that mitigating circumstances, as he previously had defined them, had no applicability to these charges. There was no objection.

Although the judge's initial instructions on mitigating circumstances contained no reference to heat of passion induced by reasonable provocation or sudden combat, this was immediately corrected, although in abbreviated form. However, the next day, in response to the jury's question, the judge reinstructed the jury correctly and conformably with the Model Jury Instructions on Homicide, *supra*, and this was the last instruction the jury heard. We have held in more compelling circumstances involving two irreconcilable instructions that, considering the charge as a whole, if the instructional center of gravity falls on the side of the correct instruction, there is no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Fickling*, 434 Mass. 9, 18-20 (2001). See also *Commonwealth* v. *Wallis*, 440 Mass. 589, 594 (2003); *Commonwealth* v. *Torres*, 420 Mass. 479, 488-491 (1995). Here, the initial error was an omission in a portion of the mitigation instruction, not a conflicting instruction. It was almost instantly corrected, although in abbreviated form, and then thoroughly corrected the next day. There was no repetitive oscillation between correct and incorrect instructions, but a steady progression toward

a correct and thorough instruction on mitigating factors. We conclude there was no substantial likelihood of a miscarriage of justice.

(b) *Excessive force in self-defense.* As previously alluded, there is a problem with the judge's instruction on excessive force in self-defense that occurred in his original charge and in his response to the jury's second question requesting reinstruction on murder, self-defense, and voluntary manslaughter. The judge inserted a transitional paragraph between the Model Jury Instructions on Homicide, *supra,* pertaining to self-defense and excessive force in self-defense. We have identified the problem as part of our review pursuant to G. L. c. 278, § 33E.

After correctly instructing on self-defense, the judge gave the following instruction:

> "If the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not act in self-defense, then you must find the defendant not guilty. If death resulted from the use of excessive force, *and the Commonwealth fails to prove beyond a reasonable doubt that the defendant did not act in self-defense,* but the Commonwealth does prove beyond a reasonable doubt that the defendant used excessive force in defending himself in light of all the circumstances, then you must find the defendant guilty of manslaughter" (emphasis added).

This instruction, using the mandatory "must" or "shall," survived § 33E review in *Commonwealth* v. *Torres, supra* at 491-492, although we did not specifically address the precise question discussed here. The italicized clause has been omitted from the Model Jury Instructions on Homicide, *supra* at 33, because of the seeming conflict with the immediately preceding sentence that concludes the instruction on self-defense. However, considering the instructions as a whole, as we must, *Commonwealth* v. *Torres, supra* at 487, we do not believe the jury would have been confused by the related concepts of self-defense and excessive force in self-defense. One of the elements of self-defense is the reasonableness of the force used to defend oneself, and if the Commonwealth fails to disprove all the elements of self-defense except the element of reasonableness of the force used, i.e., that the defendant used excessive force in self-defense, then

self-defense does not lie, but excessive force in self-defense will mitigate murder to voluntary manslaughter. See *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211 (1966). The relationship between the concepts is sufficiently clear from the instruction. The instruction did not create a substantial likelihood of a miscarriage of justice, but the italicized language in the quoted instruction should not be given in future cases.

7. *Motion for a new trial.* The defendant filed a motion for a new trial in which he alleged ineffective assistance of counsel by reason of (1) substandard cross-examination and impeachment of key Commonwealth witnesses; (2) failure to object to the prosecutor's opening statement and closing argument; (3) failure to request jury instructions and failure to object to the instructions given; and (4) failure to request a limiting instruction as to the police manuals. We review claims of ineffective assistance of counsel in the course of a direct appeal from a conviction of murder in the first degree under the more favorable standard of a substantial likelihood of a miscarriage of justice; we determine whether any substantial conduct or omission by counsel "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Where a claim is made that counsel made a tactical error, the defendant must show that counsel's judgment was manifestly unreasonable at the time. *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

The trial judge retired before the defendant filed his motion for a new trial, and the motion was decided by a different judge after an evidentiary hearing. "When a motion judge has not presided at the trial, we defer only to the judge's assessment of the credibility of witnesses at the evidentiary hearing on the new trial motion, but we consider ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992).

The defendant argues that counsel failed to ask DeAndrade and Brooke Canella, a passenger in DeAndrade's car, about criminal cases that were pending against them at the time of the defendant's trial, that he failed to impeach them with certified copies of their prior convictions, and that he failed to impeach them with prior inconsistent statements.

Trial counsel elicited evidence from DeAndrade as to his con-

victions of assault on two Taunton police officers, three convic-
tions of breaking and entering with intent to commit a felony,
two convictions of receiving stolen property, and convictions of
operating without a license, operating under the influence, and
distribution of marijuana. He also elicited testimony from De-
Andrade that he had a drunk driving case pending and possibly
a case for operating to endanger. Counsel elicited testimony from
DeAndrade that he had been selling drugs and had been using
drugs for a good portion of his life. He elicited testimony in
which DeAndrade denied making threats to Padon, Soloway, and
Ambers. This was in direct contradiction to their testimony.
Although counsel did not impeach DeAndrade with prior
inconsistent statements, he did not need to. DeAndrade's denials
of his threats were essentially self-impeaching. "[A] claim of
ineffective assistance based on a failure to use particular impeach-
ment methods is difficult to establish. Impeachment of a witness
is, by its very nature, fraught with a host of strategic considerations,
to which we will, even on § 33E review, still show deference."
*Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). Here,
counsel's cross-examination of DeAndrade was effective and
thorough, and he did not need to make use of every possible
technique or every available item. He attacked DeAndrade in the
areas where he was most vulnerable, and downplayed the areas
of his strength as a witness: he had been shot five times while
unarmed.

Counsel's cross-examination of Brooke Canella began with
her admission that she had been drinking and smoking marijuana
all day on April 7, 2001, and that she was drunk at the time of
the shootings. He elicited testimony from her that she had recently
served a sentence for conviction of larceny by credit card, and
that she had served time for intimidating a witness, although she
had no recollection if she had other convictions. Her recollection
of the events leading up to the shootings was faulty, and when
pressed about whether she and Schiano got out of the car together
and whether what she told police about that sequence of events
was the same as at trial, she said, "[W]hen things like this hap-
pen and fights are about to occur . . . you're not really thinking
of little specific things like what time it is and stuff like that."
Impeaching a witness with a prior inconsistent statement, presum-
ably to challenge her credibility, is less fruitful where the witness

already has been impeached with prior convictions, evidence of intoxication, and faulty memory. Counsel essentially testified at the hearing on the motion for a new trial that, because Canella had already been sufficiently discredited, in his judgment, the court's time and his time would be better spent on matters other than offering certified copies of records of convictions for those she could not remember, or calling a police officer to testify about her prior statement. The motion judge credited his testimony and concluded that counsel made a tactical decision that was not manifestly unreasonable. We agree.

The defendant's remaining claims of ineffective assistance of counsel are based on counsel's failure to object to the prosecutor's opening statement and closing argument, failure to request instructions based on the Model Jury Instructions on Homicide (1999) and to object to the instructions given, and failure to request limiting instructions on the jury's consideration of the police manuals. We previously have reviewed these issues in the context of other assertions of error and concluded either that there was no error, or that the error would not likely have influenced the jury's conclusion. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Consequently, these claims cannot be the basis for a determination of ineffective assistance of counsel. *Id.*

The motion for a new trial was properly denied.

8. *Motion to strike trial counsel's affidavit.* One of the defendant's claims in his motion for a new trial was an allegation that trial counsel was ineffective for telling him he had to testify, and for failing to prepare him for direct and cross-examination. Trial counsel filed an affidavit in which he describes instances when he met with the defendant and reviewed matters the defendant should consider when deciding whether to testify, and instances of his preparation of the defendant to give testimony. The affidavit was confined to responses to the defendant's charge that counsel told him he had to testify and that he did not prepare him to testify. The defendant moved to strike counsel's affidavit on the ground that it improperly disclosed matters covered by the attorney-client privilege. The motion judge concluded that the affidavit was appropriately limited to matters covered by the defendant's claim of ineffectiveness, and thus that there was no breach of the attorney-client privilege. The motion judge denied the motion to strike and considered counsel's affidavit when

deciding the motion for a new trial. The judge subsequently ruled that counsel was not ineffective. He found, in particular, based on counsel's testimony at the hearing on the motion for a new trial, that counsel competently prepared the defendant for trial, and that the decision whether the defendant would testify had been left to the defendant.

Because the defendant essentially accused trial counsel of incompetence in circumstances covered by the attorney-client privilege and to which the only witnesses were the defendant and trial counsel, the privilege must be deemed waived, in part, to permit counsel to disclose only those confidences necessary and relevant to the defense of the charge of ineffective assistance of counsel. See *Commonwealth* v. *Brito*, 390 Mass. 112, 119 (1983); *Commonwealth* v. *Woodberry*, 26 Mass. App. Ct. 636, 637 (1988). The motion judge carefully reviewed counsel's affidavit and noted that it disclosed no more than was necessary to address the claims of ineffective preparation of the defendant for testimony. There was no error.

9. *Review under G. L. c. 278, § 33E.* Although there were numerous errors, we are satisfied that, in the aggregate, they did not create a substantial likelihood of a miscarriage of justice. The judge's initial instructions were not correct, but when he reinstructed the jury in response to their second set of questions, they received a comprehensive and correct set of instructions on the applicable law of murder and manslaughter. They heard this on the last day of deliberations, and this was fresh in their minds before they returned with their verdicts. The defendant made much of the police examination manuals, but the prosecutor never directed the jury's attention to any portion of them during the trial, and we are satisfied that they did not create any prejudice. We have carefully reviewed the briefs, the entire record, and the transcripts, and we are satisfied the defendant received a fair trial, at which he was represented by competent counsel. The verdict of deliberately premeditated murder was supported by the weight of the evidence, consistent with the law, and consonant with justice. We see no reason to reduce the degree of guilt or order a new trial.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*